Slip Op. 12-160

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| GOLD EAST PAPER (JIANGSU) CO., LTD.,<br>NINGBO ZHONGHUA PAPER CO., LTD.,<br>GLOBAL PAPER SOLUTIONS, PT PINDO<br>DELI PULP AND PAPER MILLS, and PAPER<br>MAX LTD., | : | |
| | : | |
| | : | |
| *Plaintiffs,* | : | |
| v. | : | |
| UNITED STATES, | : | |
| *Defendant,* | : | Court No. 10-00368<br>PUBLIC |
| and | : | |
| APPLETON COATED LLC, NEWPAGE CORP.,<br>S.D. WARREN COMPANY D/B/A SAPPI<br>FINE PAPER NORTH AMERICA, and UNITED<br>STEEL, PAPER AND FORESTRY, RUBBER,<br>MANUFACTURING, ENERGY, ALLIED<br>INDUSTRIAL AND SERVICE WORKERS<br>INTERNATIONAL UNION AFL-CIO-CLC, | : | |
| | : | |
| | : | |
| | : | |
| *Defendant-Intervenors.* | : | |

[Denying Plaintiffs' Motion for Judgment on the Agency Record, and sustaining U.S. International Trade Commission's final threat of material injury determination]

Dated: December 21, 2012

Daniel L. Porter, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., argued for Plaintiffs. With him on the brief were James P. Durling, Matthew P. McCullough, and Ross Bidlingmaier, of the same firm, and Stephen E. Wieker, Winston & Strawn LLP, of Washington, D.C.

David B. Fishberg, Office of the General Counsel, U.S. International Trade Commission, of Washington, D.C., argued for Defendant. With him on the brief were Marc A. Bernstein, Office of the General Counsel, James M. Lyons, General Counsel, and Andrea C. Casson, Assistant General

Counsel for Litigation.

    Eric. P. Salonen, Stewart and Stewart, of Washington, D.C., argued for Defendant-Intervenors. With him on the brief were Terence P. Stewart and Philip A. Butler, of the same firm, and Gilbert B. Kaplan and Brian E. McGill, King & Spalding LLP, of Washington, D.C.

# OPINION

RIDGWAY, Judge:

    In this action, the plaintiffs – three foreign producers of certain coated paper, and two U.S.

importers of that merchandise (hereinafter, the "Foreign Producers")[1] – contest the unanimous final

determination of the U.S. International Trade Commission ("Commission" or "ITC") that imports

of such coated paper that are sold in the United States for less than fair market value and subsidized

by the Governments of the People's Republic of China ("PRC") and Indonesia posed a threat of

material injury to the U.S. domestic industry. *See* Complaint ¶ 1; Certain Coated Paper Suitable for

High-Quality Print Graphics Using Sheet-Fed Presses from China and Indonesia, Inv. Nos. 701-TA-

---

    [1] The plaintiff firms encompass U.S. importers of certain coated paper suitable for high-quality print graphics using sheet-fed presses ("coated paper") that participated in the agency proceedings, as well as several foreign producers of coated paper that participated in the agency proceedings through their corporate affiliates, Asian Pulp and Paper, Ltd. (China) and Asia Pulp and Paper, Ltd. (Indonesia) (collectively, "APP"). *See* Complaint ¶ 3; Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from China and Indonesia, Inv. Nos. 701-TA-470-471 and 731-TA-1169-1170 (Final), USITC Pub. 4192 at 3 (Nov. 2010).

    The plaintiff producers represented by APP – which were among the respondents in the underlying Commission investigation – include Chinese producers Gold East Paper (Jiangsu) Co., Ltd. and Ningbo Zhonghua Paper Co., Ltd., as well as Indonesian producer PT Pindo Deli Pulp and Paper Mills. *See* Complaint ¶ 3; Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from China and Indonesia, Inv. Nos. 701-TA-470-471 and 731-TA-1169-1170 (Final), USITC Pub. 4192 at 3 (Nov. 2010).

    The plaintiff U.S. importers are Global Paper Solutions and Paper Max Ltd. *See* Complaint ¶ 3.

470-471 and 731-TA-1169-1170 (Final), USITC Pub. 4192 at 1 (Nov. 2010).[2]  The Commission's

determination led the U.S. Department of Commerce to issue antidumping and countervailing duty

orders covering imports of the subject merchandise from the PRC and from Indonesia.[3]

      Pending before the Court is Plaintiffs' Motion for Judgment on the Agency Record.  In that

motion, the Foreign Producers assert that the Commission's affirmative final threat of material

injury determination is not supported by substantial evidence, and is otherwise not in accordance

with law.  *See generally* Respondent Plaintiffs' Brief in Support of Their Motion for Judgment on

the Agency Record ("Pls.' Brief"); Respondent Plaintiffs' Reply Brief in Support of Their Motion

---

[2]The Commission's final determinations on "material injury" and "threat of material injury" in both the antidumping and countervailing duty investigations – together with the public version of the Commission's views (cited herein as "Final Views") and the public version of the report of the Commission's staff (cited herein as "Staff Report") – are published as Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from China and Indonesia, Inv. Nos 701-TA-470-471 and 731-TA-1169-1170 (Final), USITC Pub. 4192 (Nov. 2010), P.R. Doc. 243.

      The confidential version of the Commission's views, in turn, is cited as "Conf. Final Views"; and the confidential version of the Staff Report is cited as "Conf. Staff Report."  Note that the pagination of the public versions of the Commission's Final Views and the Staff Report differ from the confidential versions of those documents.

[3]*See* Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 75 Fed. Reg. 70,201 (Dep't Commerce Nov. 17, 2010); Certain Coated Paper Suitable For High-Quality Print Graphics Using Sheet-Fed Presses From Indonesia: Countervailing Duty Order, 75 Fed. Reg. 70,206 (Dep't of Commerce Nov. 17, 2010); Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China: Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Order, 75 Fed. Reg. 70,203 (Dep't Commerce Nov. 17, 2010); Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From Indonesia: Antidumping Duty Order, 75 Fed. Reg. 70,205 (Dep't Commerce Nov. 17, 2010).

for Judgment on the Agency Record ("Pls.' Reply Brief").[4]

The Commission and Defendant-Intervenors – three domestic producers of coated paper, and a labor union (hereinafter the "Domestic Producers")[5] – oppose the Foreign Producers' motion and maintain that the Commission's determination should be sustained in all respects. *See generally* Defendant's Memorandum in Opposition to Motion of Plaintiffs for Judgment on the Agency Record ("Def.'s Brief"); Defendant-Intervenors' Response in Opposition to Plaintiffs' Motion for Judgment on the Agency Record ("Def.-Ints.' Brief").

Jurisdiction lies under 28 U.S.C. § 1581(c) (2006).[6]   For the reasons set forth below, Plaintiffs' Motion for Judgment on the Agency Record must be denied.[7]

---

[4]Because the administrative record in this action includes confidential information, the parties filed both public and confidential versions of all briefs. Citations to briefs are to the public versions whenever possible, and except as specified. Citations to the confidential version of a brief are prefaced with "Conf."

[5]Defendant-Intervenors – petitioners in the underlying agency investigation – include Appleton Coated LLC, NewPage Corporation, and S.D. Warren Company d/b/a Sappi Fine Paper North America, as well as the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union. *See* Complaint ¶ 5; Final Views at 3.

[6]All citations to federal statutes are to the 2006 edition of the United States Code.

[7]The Foreign Producers did not brief the issues raised in Counts One and Five of their Complaint. *See* Complaint ¶¶ 11-13 (Count One) (disputing the Commission's domestic "like product" determination); *id.* ¶¶ 8, 23-24 (Count Five) (alleging "Improper Congressional Interference" in Commission investigation at issue). The claims set forth in those two counts are therefore waived. *See, e.g.*, SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319-20 (Fed. Cir. 2006) (explaining, *inter alia*, that it is "well established that arguments not raised in the opening brief are waived"); Novosteel SA v. United States, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002) (same).

## I. __Background__

The nation's international trade laws require that antidumping and countervailing duties be imposed upon imported merchandise in cases of dumping (*i.e.*, where merchandise "is being, or is likely to be, sold in the United States at less than . . . fair value") and in cases where the merchandise is the product of an improper subsidy (*i.e.*, where "a countervailable subsidy is being provided with respect to the . . . merchandise") – but only when the dumping or subsidies result in "material injury or the threat of material injury" to a domestic industry. *See* 19 U.S.C. §§ 1671, 1673.

In cases where dumping is alleged, the U.S. Department of Commerce is charged with determining whether the imported merchandise "is being, or is likely to be" dumped. *See* 19 U.S.C. § 1673d(a)(1). Similarly, where prohibited subsidies are alleged, Commerce determines whether the imported merchandise is the beneficiary of a "countervailable subsidy." *See* 19 U.S.C. § 1671d(a)(1).

In both antidumping and countervailing duty cases, the role of the Commission, in turn, is to make the requisite "injury" determination – that is, to determine whether the alleged dumping or subsidies result in "material injury or the threat of material injury" to the domestic industry at issue. *See* 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1). Material injury is defined as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A).

To make an affirmative determination of material injury, the Commission must conclude that imports are having an adverse impact on the domestic industry *at present*. 19 U.S.C. § 1677(7)(C). In contrast, to reach an affirmative determination of threat of material injury, the Commission must conclude (in relevant part) that "further dumped or subsidized imports are imminent" and that

"material injury by reason of imports would occur unless an [antidumping or countervailing duty] order is issued . . . ." 19 U.S.C. § 1677(7)(F)(ii).  In reaching a determination on "threat of material injury," the Commission is to analyze certain statutory threat factors before making its final decision.  *See* 19 U.S.C. § 1677(7)(F)(i) (listing threat factors).  Whether evaluating "material injury" or "threat of material injury," the Commission must consider the effect of the volume of imports on the domestic industry, the effect of imports on domestic prices, and whether there is likely injury to the domestic industry caused by imports.  *See* 19 U.S.C. §§ 1677(7)(B)(i), 1677(7)(F)(i).

The record of the agency proceeding here documents the Commission's consideration of the domestic industry's allegations of "material injury" and "threat of material injury" in both the antidumping and countervailing duty investigations, covering the period January 2007 through June 2010 (the "period of investigation").  The Commission organized its final views by separately addressing volume, price effects, and the impact of the subject imports.  *See* Final Views at 26-39.  As to each topic, the Commission first considered the allegations of present material injury, then the threat of material injury.  *See* Final Views at 26-39.

Ultimately, based on the record compiled before it, the Commission reached a negative final determination on "material injury," concluding that there was no present material injury to the domestic coated paper industry.  *See* Final Views at 26.[8]  However, the Commission concluded that – in light of its findings on likely subject import volume, likely price effects, and the likely impact of subject imports on the domestic industry – imports of coated paper from the PRC and Indonesia

_____

[8]One member of the Commission filed separate views, reaching a final affirmative determination as to "material injury."  *See* Final Views at 46.

would increase in the imminent future and that material injury due to such imports would occur

absent imposition of antidumping and countervailing duties.   Final Views at 38-39.   The

Commission therefore reached an affirmative final determination on "threat of material injury,"

concluding – unanimously – that imports of coated paper from the PRC and Indonesia threatened

the domestic industry.  *See* Certain Coated Paper Suitable For High-Quality Print Graphics Using

Sheet-Fed Presses From China and Indonesia: Determinations, 75 Fed. Reg. 70,289 (ITC Nov. 17,

2010); *see also* Final Views at 3.

     The Commission's affirmative determination on threat of material injury led to the issuance

of antidumping and countervailing duty orders by Commerce.  *See* n.3, *supra.*

     This action followed.

## II.  Standard of Review

     In reviewing a challenge to a final determination, the Commission's determination must be

upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in

accordance with the law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence" is "more than a

mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477-78 (1951) (*quoting*

Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); *see also* Consolo v. Federal Maritime

Comm'n, 383 U.S. 607, 620 (1966) (defining "substantial evidence" as "something less than the

weight of the evidence").

     "[A] party challenging the Commission's determination under the substantial evidence

standard 'has chosen a course with a high barrier to reversal.'"  Nippon Steel Corp. v. United States,

458 F.3d 1345,1352, 1358 (Fed. Cir. 2006) (*quoting* <u>Mitsubishi Heavy Indus., Ltd. v. United States,</u>

275 F.3d 1056, 1060 (Fed. Cir. 2001)).  That party "bears the burden of proving the evidence [is]

inadequate." <u>Micron Tech., Inc. v. United States</u>, 117 F.3d 1386, 1397 (Fed. Cir. 1997).

It is, of course, true that any evaluation of the substantiality of evidence "must take into

account whatever in the record fairly detracts from its weight," including "contradictory evidence

or evidence from which conflicting inferences could be drawn." <u>Suramerica de Aleaciones</u>

<u>Laminadas, C.A. v. United States</u>, 44 F.3d 978, 985 (Fed. Cir. 1994) (*quoting* <u>Universal Camera</u>

<u>Corp.</u>, 340 U.S. at 487-88); *see also* <u>Mittal Steel Point Lisas Ltd. v. United States</u>, 548 F.3d 1375,

1380-81 (Fed. Cir. 2008) (same)).  However, the mere fact that it may be possible to draw two

inconsistent conclusions from the record does not prevent the agency's determination from being

supported by substantial evidence. <u>Am. Silicon Techs. v. United States</u>, 261 F.3d 1371, 1376 (Fed.

Cir. 2001); *see also* <u>Consolo v. Federal Maritime Comm'n</u>, 383 U.S. at 620.

In short, "[i]t is not the function of a court to decide that, were it the Commission, it would

have made the same decision on the basis of the evidence." <u>Matsushita Elec. Indus. Co. v. United</u>

<u>States</u>, 750 F.2d 927, 936 (Fed. Cir. 1984).  The court's role is "limited to deciding whether the

Commission's decision is unsupported by substantial evidence on the record, or otherwise not in

accordance with law." *Id.* (internal quotations omitted).

And "when the totality of the evidence does not illuminate a black-and-white answer to a

disputed issue, it is the role of the expert factfinder – here the majority of the Presidentially-

appointed, Senate-approved Commissioners – to decide which side's evidence to believe." <u>Nippon</u>

<u>Steel Corp.</u>, 458 F.3d at 1359.  "So long as there is adequate basis in support of the Commission's

choice of evidentiary weight, the Court of International Trade . . . , reviewing under the substantial

evidence standard, must defer to the Commission." *Id.*

## III. Analysis

As discussed above, the Commission's responsibility in antidumping and countervailing duty

investigations is to determine whether the domestic industry in question is being "materially injured

or is threatened with material injury" by reason of imports. 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1);

*see generally* section I, *supra.*

In determining whether a domestic industry is threatened with material injury by reason of

imports of specified merchandise, the Commission is directed to consider, "among other relevant

economic factors," nine enumerated statutory threat factors:

> (I) if a countervailable subsidy is involved, such information as may be presented to
> [the Commission] by [Commerce] as to the nature of the subsidy . . . , and whether
> imports of the subject merchandise are likely to increase,
>
> (II) any existing unused production capacity or imminent, substantial increase in
> production capacity in the exporting country indicating the likelihood of substantially
> increased imports of the subject merchandise into the United States, taking into
> account the availability of other export markets to absorb any additional exports,
>
> (III) a significant rate of increase of the volume or market penetration of imports of
> the subject merchandise indicating the likelihood of substantially increased imports,
>
> (IV) whether imports of the subject merchandise are entering at prices that are likely
> to have a significant depressing or suppressing effect on domestic prices, and are
> likely to increase demand for further imports,
>
> (V) inventories of the subject merchandise,
>
> (VI) the potential for product-shifting if production facilities in the foreign country,
> which can be used to produce the subject merchandise, are currently being used to
> produce other products,

(VII) in any investigation . . . [involving] imports of both a raw agricultural product . . . and any product processed from such raw agricultural product, the likelihood that there will be increased imports, by reason of product shifting, if there is an affirmative determination by the Commission . . . with respect to either the raw agricultural product or the processed agricultural product (but not both),

(VIII) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).

19 U.S.C. § 1677(7)(F)(i).

The Foreign Producers' threshold attack on the Commission's threat of injury determination is their claim that the Commission erred in basing its determination principally on a subset of the nine statutory threat factors – specifically, factors (II), (III), (IV), and (IX). Pls.' Brief at 8-9. The Foreign Producers contend that – because the Commission did not specifically discuss all nine factors – the Commission's determination is "not in accordance with the law." Pls.' Brief at 8-9.

The Foreign Producers misinterpret the requirements of 19 U.S.C. §1677(7)(F)(i). Pls.' Brief at 7-9. In a threat of material injury determination, the Commission is required to consider the nine specifically enumerated factors in assessing the possible threat of imminent injury to the U.S. industry, to the extent that is appropriate. *See* 19 U.S.C. § 1677(7)(F)(i). In its determination here, the Commission focused its analysis principally on four of the nine statutory factors. *See* Final Views at 21-22 n.126, 31 n.201.

As the Commission noted, statutory threat factor (VII) is not applicable, because no imports of agricultural products were involved. Final Views at 21-22 n.126; *see also* 19 U.S.C. §

1677(7)(F)(i)(VII).  Surely the Foreign Producers do not contend that the Commission was required to engage in an extended discussion of factor (VII).  Statutory threat factor (VIII) also is not applicable.  There is no suggestion that the domestic industry is currently engaging in, or will imminently engage in, any efforts to "develop a derivative or more advanced version of the domestic like product."  Final Views at 21-22 n.126; *see also* 19 U.S.C. § 1677(7)(F)(i)(VIII).

As for the remaining statutory threat factors, it is true that factors (I), (V), and (VI) were not as thoroughly addressed in the Commission's final views as factors (II), (III), (IV), and (IX).  Pls.' Brief at 8-9.[9]  However, the extent of the Commission's discussion of any particular factor does not, in itself, render the Commission's determination not lawful.[10]  Moreover, the Foreign Producers have not established that the factors that the Commission discussed "only in passing" are so significant to the analysis as to "seriously undermine[] [the Commission's] reasoning and conclusions."  Altx, Inc. v. United States, 25 CIT 1100, 1117-18, 167 F. Supp. 2d 1353, 1374 (2001).

As the Court of Appeals has underscored, "the Commission need only discuss 'material issues of law or fact.'"  Timken U.S. Corp. v. United States, 421 F.3d 1350, 1356 (Fed. Cir. 2005)

---

[9]In its volume analysis, the Commission briefly discussed factor (V) (*i.e.*, inventories of subject merchandise) and factor (VI) (*i.e.*, product-shifting).  *See* Final Views at 31 n.201.  The Commission explained that these factors did not play a substantial role in the threat of injury determination.  *See* Final Views at 31 n.201.  The Commission also discussed factor (I), the nature of the import subsidies found by Commerce, in its analysis of likely increase of volume.  *See* Final Views at 35 n.229.

[10]Congress has acknowledged the fact-intensive nature of injury investigations, emphasizing that "[t]he significance of the various factors affecting an industry will depend upon the facts of each particular case.  Neither the presence nor the absence of any factor listed in the bill can necessarily give decisive guidance with respect to whether an industry is materially injured, and the significance to be assigned to a particular factor is for the ITC to decide."  S. Rep. No. 96-249 at 88 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 474.  Congress has instructed that, in determining threat of material injury, the Commission is to consider "any economic factors it deems relevant."  *Id.*

(*citing* Nat'l Ass'n of Mirror Mfrs. v. United States, 12 CIT 771, 780, 696 F. Supp. 642, 649

(1988)); *see also* Metallverken Nederland B.V. v. United States, 13 CIT 1013, 1035, 728 F. Supp.

730, 746 (1989) ("[T]here is no requirement that an affirmative determination be based upon an

affirmative finding as to all the factors."). Even more to the point, the Court of Appeals has held

that the Commission is entitled to "use its sound discretion in determining the weight to afford these

and all other factors." Suramerica, 44 F.3d at 984. Nothing cited by the Foreign Producers suggests

an abuse of that discretion here. *See* Metallverken, 13 CIT at 1029, 728 F. Supp. at 742 (affirming

Commission's threat of material injury determination based on less than nine factors); *see also* Goss

Graphic Sys., Inc. v. United States, 216 F.3d 1357, 1363 (Fed. Cir. 2000) (same).

        The bulk of the Foreign Producers' arguments target the Commission's findings on statutory

threat factors (II), (III), (IV), and (IX) – the factors that the Commission addressed in greater detail.

The Foreign Producers claim that the Commission did not properly address these four factors and

that, as such, the Commission's affirmative final threat of injury determination improperly rested

on "mere speculation and conjecture" and on findings that are otherwise "not supported by

substantial evidence on the record." Pls.' Brief at 8.

        As discussed in further detail below, the Foreign Producers' arguments are without merit.

A.  The Commission's Analysis of the Volume of Imports
Statutory Threat Factors (II) and (III)

        In a threat of material injury analysis, the Commission is required to analyze the significance

of likely future increases in the volume or market share of imports in the U.S. market, and whether

such increases indicate a likely substantial growth in imports into the United States. *See* 19 U.S.C.

§ 1677(7)(F)(i)(III).  In addition, the Commission must consider any increase in foreign producers'
capacity and the likelihood that such an increase would give rise to future substantial growth in the
volume of imports into the United States.  *See* 19 U.S.C. § 1677(7)(F)(i)(II).

In the instant case, the Commission found the capacity to produce coated paper likely to
increase in both Indonesia and the PRC.  Final Views at 28.  With respect to Chinese capacity, the
Commission noted that the parties agreed that capacity would increase between 2010 and 2011, but
disagreed as to the extent of the projected increase.  Final Views at 28.  Further, the Commission
found that the subject producers were likely to utilize the additional capacity to increase shipments
to the United States.  Final Views at 28.  Throughout the investigation period, APP – the
predominant exporter of coated paper in both the PRC and Indonesia, and the entity that represented
and was affiliated with individual subject producers such as plaintiffs here – aggressively sought to
increase exports to the United States.  Final Views at 3, 24, 28-29.[11]  For example, in 2008, APP
lost Unisource (a leading U.S. distributor) as a source for U.S. distribution.  Shortly thereafter, APP
established its own distributor, Eagle Ridge Paper, to retain and increase its presence in the U.S.
market.  Final Views at 24, 29.[12]  Record evidence also established that exporters could readily
increase their U.S. market share due to their familiarity with the distribution network and the
prevalence of spot market sales.  Final Views at 28-29.

_____

[11]According to the Commission, APP's affiliated companies accounted for "[[          ]] of
reported subject imports in 2009."  Conf. Final Views at 40.

[12][[


]] Conf. Final Views at 39-40.

Finally, the Commission considered the historic increase in the volume and market penetration of the subject imports from 2007 to 2009. Final Views at 27. Specifically, the Commission found that, in 2009, APP's loss of its major distributor was offset by increased sales to other accounts. Final Views at 29-30. The Commission similarly found that subject imports generally continued to increase even after APP lost its certification from the Forest Stewardship Council ("FSC") in November 2007. Final Views at 30.[13]

In addition, the Commission found that, due to significant increases in production capacity, Chinese and Indonesian producers of coated paper had both the ability and the incentive to increase exports of subject merchandise to the United States in the imminent future. Final Views at 30. Accordingly, the Commission concluded that, absent the imposition of antidumping and countervailing duty orders, the increases in volume of imports of coated paper from the PRC and Indonesia that occurred during the period of investigation were likely to continue. Final Views at 27.

The Foreign Producers challenge the Commission's finding on Chinese production capacity, claiming that the finding is based on speculation and fails to meet the substantial evidence standard. *See* Pls.' Brief at 10-17. The Foreign Producers also dispute the factual basis for the Commission's conclusion that increases in the volume and market penetration of subject imports in the United States were significant and would likely lead to substantial growth in imports into the United States. *See* Pls.' Brief at 18-26.

---

[13]Certification by the Forest Stewardship Council indicates to customers that a paper product satisfies "general sustainability criteria."  APP Pre-Hearing Brief, C.R. Doc. 296 at Exh. 33 ¶ 2.

1.  Production Capacity

Under the statute, the Commission was required to assess any latent capacity to produce

coated paper in the PRC, the possibility of substantially increased imports to the United States, and

the availability of other export markets to absorb any additional exports. *See* 19 U.S.C. §

1677(7)(F)(i)(II).  The Commission found that the evidence of production capacity in the PRC

during the period of investigation and projections as to future capacity indicated a threat to the U.S.

domestic industry. *See* Final Views at 28-30.[14]

The Foreign Producers do not dispute that Chinese production capacity will increase within

the imminent future. *See* Pls.' Brief at 10-11.  Rather, the Foreign Producers take issue with the

projected additional capacity and the Commission's determination that such additional capacity was

substantial and likely to increase imports into the United States. Pls.' Brief at 11.

a.  Chinese Production Capacity

The Commission found a significant imminent increase in the Chinese manufacturers'

production capacity that would likely lead to a substantial increase in actual production.  Final

Views at 28 n.181.  In its analysis, the Commission relied on Resource Information Systems Inc.

("RISI") projections of future Chinese consumption of coated paper and capacity to produce coated

paper. Final Views at 28 n.181.[15]

---

[14]The Commission was also required to assess any latent production capacity in Indonesia, and it did so. *See* Final Views at 28.  The Foreign Producers have challenged the Commission's findings only as to the PRC.

[15]RISI is an information provider for the global forest products industry. Final Views at 28. In the underlying investigation, both petitioners and respondents relied upon data published by RISI. *See* Final Views at 28.

In its analysis, however, the Commission did not use RISI's projected capacity utilization rate of approximately 93%. *See* Staff Report at II-8. Instead, the Commission used a projected capacity utilization rate derived from the Chinese producers' questionnaire responses. *See* Staff Report at II-8, VII-7 (Table VII-2). Responding Chinese producers projected a capacity utilization rate of 99.2% of total production capacity in 2010 and 99.3% in 2011. Staff Report at II-8. Because 99.2% and 99.3% roughly equal 100%, the Commission concluded that Chinese manufacturers' future actual production of coated paper would roughly equal the manufacturers' future production capacity. Based on the RISI projections for consumption and production capacity, as well as a projected capacity utilization rate of essentially 100%, the Commission concluded that there would be approximately 900,000 metric tons of additional Chinese coated paper that would not be absorbed by the Chinese domestic market. Final Views at 28 n.181.

The Foreign Producers contend that the Commission should have used RISI's lower projected capacity utilization rate, rather than the rate derived from the Chinese producers' questionnaire responses. Pls.' Brief at 12. The Foreign Producers emphasize that the Commission relied on RISI data to support most of its analysis, and charge that the Commission selectively "cherry picked" the questionnaire data here to support its production capacity determination. Pls.' Brief at 12; Pls.' Reply Brief at 5.[16]

_____

[16]The Foreign Producers dispute the reasonableness of the Commission's assumption that – as the Foreign Producers put it – "every ton of capacity will equal to a ton of production." Pls.' Brief at 12. The Foreign Producers argue that no "factory can operate perfectly and production rarely equals capacity." Pls.' Brief at 12. It is no doubt true that no factory can operate perfectly all the time. However, the ability of factories to operate at or near full capacity is not clear on the record. The Foreign Producers have provided no evidence on point. In contrast, the Domestic Producers point to record evidence indicating that "actual production can exceed rated name plate capacity." Def.-Ints.' Brief at 23 n.12. As the Domestic Producers noted, APP started a new paper

As a general principle, however, the Commission has the discretion to rely on questionnaire

data in circumstances such as these, so long as the Commission does not act arbitrarily.  Int'l

Imaging Materials, Inc. v. U.S. Int'l Trade Comm'n, 30 CIT 1181, 1187 (2006) (citing Bando Chem.

Indus., Ltd. v. United States, 17 CIT 798, 799 (1993), aff'd, 26 F.3d 139 (Fed. Cir. 1994))

("Although the ITC is permitted to make varying determinations based on the facts of each case, it

may not act arbitrarily. . . . [T]he ITC must present a 'reviewable, reasoned basis' for its

determinations.").[17]

Here, according to the Commission, RISI's data were based on a category of paper products

"somewhat broader than the paper defined by Commerce's scope."  Final Views at 28 n.181.  In

contrast, the scope of the data collected by the questionnaire responses was within the parameters

of the industry as defined by Commerce for this investigation.[18]  The Commission thus provided

---

mill in April 2010 with a rate of capacity of 900,000 metric tons per year; yet the paper mill
"churn[ed] out up to 1.45 million metric tons per year."  Def.-Ints.' Brief at 23 n.12 (citing
Petitioners' Pre-hearing Brief, P.R. Doc. 164 at 56). Here, the questionnaire data collected from the
Chinese producers themselves projected a capacity utilization rate of slightly more than 99%. Def.-
Ints.' Brief at 23 (citing Staff Report at VII-7 (Table VII-2)).

[17]In their reply brief, the Foreign Producers argue that the Government cannot rely on the
questionnaire data to support the Commission's determination in this forum, because – according
to the Foreign Producers – the Commission did not rely on the questionnaire data in reaching its
final determination.  Pls.' Reply Brief at 5.  But the Foreign Producers are simply wrong on the
facts.  The Commission's staff report, part of the Commission's final views, in fact did rely on
capacity utilization data from Chinese producers' questionnaire responses. See Staff Report at II-8,
VII-7 (Table VII-2).  The Government is thus free to make its case based on those data.

[18]The Government takes issue with the Foreign Producers' representations concerning the
extent of the Commission's reliance on RISI data.  The Government explains that the Commission
has a general preference for questionnaire data in its investigations, but used RISI data here as a
"proxy" for missing questionnaire data. Def.'s Brief at 20. Thus, for example, the Commission used
RISI data where questionnaire responses did not provide projections for consumption of coated
paper in China and Asia. Def.'s Brief at 20. However, the Commission did not rely on RISI data

adequate support for the "choices made among various potentially acceptable alternatives" in its decision to rely on questionnaire data.  Int'l Imaging Materials, Inc., 30 CIT at 1187 (citation omitted); *see also* Nippon Steel Corp., 458 F.3d at 1351 (*quoting* Universal Camera Corp., 340 U.S. at 477-78 (explaining that a reviewing court must determine whether there exists "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion")).

The Foreign Producers claim that historical production capacity utilization rates provide "contrary evidence" establishing the Chinese producers' capacity utilization rate to have been about 93%.  *See* Pls.' Brief at 12.  It is true that the evidence prior to the first half of ("interim") 2010 shows a lower capacity utilization rate than that used by the Commission.  *See* Staff Report at VII-7. However, data reported from the first half of 2010 (the most recent period for which historical data was reported) show the *same* capacity utilization rate used by the Commission – 99%.  Def.'s Brief at 21-22; *see also* Staff Report at VII-7 (Table VII-2).  The most recent historical data thus support the Commission's use of a 99% capacity utilization rate.  *See* Staff Report at VII-7 (Table VII-2). The Foreign Producers' challenges cannot carry the day.

### b. & c.  Other Export Markets

After determining the likely increase in Chinese production capacity and the additional production volume that would result therefrom, the Commission analyzed whether additional production was likely to substantially increase imports into the United States.  *See* 19 U.S.C. § 1677(7)(F)(i)(II).  In so doing, the Commission is directed to consider export markets other than the

for projected capacity utilization rates, because questionnaire data was available.  *See* Staff Report at II-8, VII-7 (Table VII-2).

United States and the ability of those markets to absorb any additional exports from the foreign producers' increased production capacity. *See* 19 U.S.C. § 1677(7)(F)(i)(II).

Here, the Foreign Producers challenge the Commission's analysis as based on an assumption that a substantial proportion of the additional capacity projected in the PRC would be directed to the United States. Pls.' Brief at 14. According to the Foreign Producers, the Commission's determination failed to consider the possibility that the increase in Chinese-made subject merchandise would displace imports into the PRC and the Chinese manufacturers' potential to increase sales in the Asian market. *See* Pls.' Brief at 13-17.

### i. *Chinese Market*

The Foreign Producers claim that the Commission's production capacity analysis did not address "substantial record evidence that Chinese producers were capturing a larger and larger share of the Chinese market in excess of consumption growth." Pls.' Brief at 14.[19] The Foreign Producers cite evidence of Chinese producers allegedly increasing their share of the Chinese market. Pls.' Brief at 14. The Foreign Producers also refer to Chinese customs data which, according to the Foreign Producers, show a "steady rate of decline" in imports of coated paper into the PRC "since at least 2005." Pls.' Brief at 14. The Foreign Producers point to these facts as proof that Chinese

---

[19]The Foreign Producers cite the views of one RISI graphic paper economist as evidence that "Chinese producers would focus efforts on the domestic and regional markets" rather than the United States. Pls.' Brief at 14; *see* APP Pre-Hearing Brief, C.R. Doc. 296 at Exh. 36 (RISI article). In an article, the economist expresses his own personal opinions concerning the markets that he expects Chinese producers to target. *See* APP Pre-Hearing Brief, C.R. Doc. 296 at Exh. 36 (RISI article). Contrary to the Foreign Producers' assertions, the economist's article was not "conveniently ignored" by the Commission. Pls.' Brief at 14. As the Domestic Producers observe, however, a single article – without more – does not invalidate the Commission's findings. *See* Def.-Ints.' Brief at 24 n.13.

producers are not concerned about increasing their presence in the U.S. market. Pls.' Brief at 14.

But the Foreign Producers' arguments are not borne out by the Chinese customs data. Those data merely depict decreasing imports of coated paper into the PRC. *See* Pls.' Brief at 14 (explaining Chinese customs data). The data do not constitute substantial evidence that Chinese producers of coated paper were capturing a larger share of the Chinese market. This is especially true in light of the Commission's staff report, which shows the Chinese producers' share of the Chinese market as constant. *See* Conf. Staff Report at VII-10 (Table VII-2). In addition, the record documents the percentage of shipments that Chinese producers directed to the home market as decreasing during the period of investigation.[20] The Foreign Producers' argument thus consists of little more than speculation based on decreased imports into the PRC. Absent concrete, direct evidence that the Chinese producers were increasing their share of the Chinese market, the Foreign Producers gain no traction against the Commission's findings and determination.

## ii. *Asian Markets*

The Foreign Producers further contend that the Commission's determination that increased Chinese production would be directed to the United States did not adequately address opportunities for Chinese producers in the Asian regional market. *See* Pls.' Brief at 15. Specifically, the Foreign Producers argue that the Commission erred in not accounting for the potential for Chinese exports to displace third-country imports into the Asian region. Pls.' Brief at 16.

According to the Foreign Producers, data from 2007 to 2009 indicate that 95% of Chinese

---

[20]As documented in the Commission's staff report, the percentage of total quantity of shipments to the Chinese home market was 65.5% in 2007, 62.7% in 2008, and 61.5% in 2009. Staff Report at VII-7 (Table VII-2).

exports of subject merchandise went to countries other than the United States. *See* Pls.' Brief at 16. The Foreign Producers also cite to data showing that Chinese exports to the United States increased at a slower pace than exports to other markets during the same period of time. *See* Pls.' Brief at 16. The Foreign Producers claim that this evidence casts into doubt the Commission's conclusion that Chinese exports would target the U.S. market. Pls.' Brief at 16. The Foreign Producers conclude that the Commission's determination was unlawful, because – according to the Foreign Producers – the Commission failed to properly analyze "other export markets." Pls.' Brief at 15 (*citing* 19 U.S.C. § 1677(7)(F)(i)(II)).

The data cited by the Foreign Producers do not, *per se*, undermine the Commission's conclusion that Chinese producers would target the U.S. market. In its analysis, the Commission gave great weight to Chinese producers' concerted efforts to target the U.S. market. *See* Final Views at 29-30. As discussed elsewhere herein, the evidence of those efforts included APP's own efforts to establish a distribution network in the United States. *See* section III.A.2.b.ii, *infra*; n.12, *supra*. Moreover, the Commission's analysis of "other export markets" found no evidence that the growth in consumption in the rest of Asia would be able to absorb the excess Chinese production. Final Views at 28 n.181.[21]

Similarly unavailing is the Foreign Producers' claim that the Commission ignored the potential for Chinese exports to displace third-country imports into Asia. *See* Pls.' Brief at 16-17.[22]

_____

[21]Based on RISI data, the Commission projected that – between 2009 and 2011 – demand in the rest of Asia would exceed growth in production by 160,000 tons. Final Views at 28 n.181.

[22]The Foreign Producers cite RISI data, suggesting that as much as 228,000 metric tons of non-Asian imports into Asian markets were vulnerable to displacement by Chinese exports. Pls.' Brief at 17.

The Foreign Producers highlight an article by a RISI economist, opining on the vulnerability of
non-Asian imports to displacement by Chinese imports. *See* Pls.' Brief at 17. As previously
discussed (*see* n.19, *supra*), however, a single article such as this is entitled to limited weight,
particularly given the contrary record evidence and the very substantial discretion that is afforded
the Commission. Moreover, record data squarely contradict the Foreign Producers' assertions that
Chinese producers were increasing their focus on Asian markets. Def.'s Brief at 22. The
questionnaire data, for example, indicate that the percentage of the Chinese producers' shipments
to Asian markets was constant, and showed no increase from 2007 to 2009. Def.'s Brief at 22
(*citing* Conf. Staff Report at VII-10).

       Aside from one article by a RISI economist, the Foreign Producers proffered no affirmative
evidence to establish that Chinese producers have taken any significant steps to increase their
presence in the Asian market. The Foreign Producers' arguments must therefore be rejected.


                            2. <u>Volume and Market Penetration</u>

       As part of its threat of material injury analysis, the Commission is required to consider the
effect of any significant rate of increase in import volume or market penetration of subject imports
in the U.S. market. *See* 19 U.S.C. § 1677(7)(F)(i)(III). In its affirmative final determination in this
case, the Commission found the increase in imports of coated paper from the PRC and Indonesia
during the period of investigation to be significant, both on an absolute basis and relative to apparent
U.S. production and consumption. Final Views at 27. The quantity of imports increased by more
than 15,000 short tons from 2008 to 2009, despite a 21.3% decline in U.S. consumption over the

same period. Final Views at 27 n.172. The Commission relied on these trends, together with evidence of the Chinese producers' interest in the U.S. market, in reaching its affirmative determination. *See* Final Views at 30-31.

The Foreign Producers claim that the Commission failed to explain why it concluded that the increases in import volume and market share were significant. Pls.' Brief at 18; *see* section III.A.2.a, *infra*. Further, the Foreign Producers argue that the Commission ignored affirmative evidence refuting its predictions that the rates of increase gave rise to a "likelihood of substantially increased imports" into the United States. Pls.' Brief at 18-26; *see* section III.A.2.b, *infra*.

### a. Significant Rate of Increase of Future Volume or Market Penetration of Imports

The Foreign Producers protest the Commission's conclusion that the increased rates of import volume and market penetration found were significant. Final Views at 26-27; Pls.' Brief at 19. The Foreign Producers dispute the Commission's methodology, and, in addition, assert that the Commission's ultimate finding of a "significant" rate of increase was not supported by substantial evidence. Pls.' Brief at 19-21.

### i. *Commission Methodology*

In its determination of the "significance" of the rates of increase, the Commission acknowledged that imports from the PRC and Indonesia declined during the first half of 2010. Final Views at 27. The Commission found that the sharp decline in subject import volume began in March 2010 – the month in which Commerce issued its preliminary countervailing duty determination, and thus imposed provisional duties on subject imports. Final Views at 27, 29 n.191.

The Foreign Producers themselves acknowledge that the interim 2010 declines in the volume of subject imports were due to the pending trade cases. Pls.' Brief at 21; *see also* Final Views at 27.

Under the statutory scheme, the Commission is authorized to accord less weight to data for the period following the commencement of a trade investigation, if the Commission finds that changes in the volume, price effects, and impact of the subject imports are attributable to the pendency of an investigation. *See* 19 U.S.C. § 1677(7)(I).[23] Here, the Commission invoked and applied that provision of the statute to justify discounting the 2010 data in the underlying investigation. *See* Final Views at 27 n.174.

The Foreign Producers claim that – instead of merely reducing the weight accorded it – the Commission effectively ignored the 2010 data, in disregard of 19 U.S.C. § 1677(7)(I). Pls.' Brief at 21-22. Specifically, the Foreign Producers allege that the Commission failed to compare data from the second half of 2010 to the first half of 2009, and did not account for the drop in volume of subject imports in the first half of 2010 as compared to the second half of 2009. Pls.' Brief at 21-22.

The Foreign Producers' claim is unfounded. The Commission collected and compiled data for 2010, included the data in the staff report and its tables, and discussed the data in the

---

[23] 19 U.S.C. § 1677(7)(I) provides, in relevant part:

The Commission shall consider whether any change in the volume, price effects, or impact of imports of the subject merchandise since the filing of the petition in an investigation under part I or II of this subtitle is related to the pendency of the investigation and, if so, the Commission may reduce the weight accorded to the data for the period after the filing of the petition in making its determination of material injury, threat of material injury, or material retardation of the establishment of an industry in the United States.

19 U.S.C. § 1677(7)(I).

Commission's final views. *See, e.g.*, Final Views at 27, 29-30; *see generally* Staff Report. In its

determination, the Commission took note of the steep decline in import volume after March 2010,

and concluded that the decline (and other such developments) were attributable to the pending trade

cases. Final Views at 30. Accordingly, the Commission did not ignore 2010 data. Rather, the

Commission considered the data, but then discounted its value due to the pending trade

investigations, in accordance with the applicable statute. "Courts have repeatedly recognized that

the initiation of antidumping and countervailing duty proceedings can create an artificially low

demand for subject imports, thereby distorting post-petition data compiled by the Commission."

Statement of Administrative Action, Uruguay Round Agreements Act ("SAA"), H.R. Doc. No. 103-

316, Vol. 1, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4186 (1994)[24]; *see, e.g.*, USX Corp. v. United

States, 11 CIT 82, 88, 655 F. Supp. 487, 492 (1987) (same); Rhone-Poulenc, S.A. v. United States,

8 CIT 47, 53, 592 F. Supp. 1318, 1324 (1984) ("[T]he antidumping order, operating as a strong

corrective or deterrent can be presumed to distort the meaningfulness of observable data regarding

present conduct in the United States market.") (citations omitted).

    As a result of the pending investigations, the Commission made a reasonable decision – well

within its discretion, and, indeed, expressly contemplated by statute – to accord less weight to data

for 2010. *See* Wieland Werke, AG v. United States, 13 CIT 561, 576, 718 F. Supp. 50, 61 (1989)

("[T]he Commission acted reasonably in gathering the data, identifying its inherent weaknesses, and

---

[24]The SAA "represents an authoritative expression by the Administration concerning its
views regarding the interpretation and application of the Uruguay Round agreements." Statement
of Administrative Action, Uruguay Round Agreements Act ("SAA"), H.R. Doc. No. 103-316,
*reprinted in* 1994 U.S.C.C.A.N. 4040, 4140 (1994). "[I]t is the expectation of the Congress that
future Administrations will observe and apply the interpretations and commitments set out in this
Statement." SAA at 4186.

tempering its reliance on the data"); *see also* <u>Corus Staal BV v. U.S. Int'l Trade Comm'n</u>, 27 CIT 459, 470 (2003), *aff'd*, 85 F. App'x 772 (Fed. Cir. 2004) ("The Commission, having found that changes in subject import volume, price effects, and impact were related to the pendency of the investigation, acted within its discretion in discounting post-petition data.") (*citing* 19 U.S.C. § 1677(7)(I)). The Foreign Producers' claims that the Commission simply ignored the 2010 data have no foundation in fact.

The Foreign Producers' argument that the Commission should have used semi-annual trends in its investigation is similarly without merit. Pls.' Brief at 21. There is no requirement that the Commission base its findings on semi-annual data. *See* <u>Altx, Inc. v. United States</u>, 26 CIT 1425, 1437 (2002), *aff'd*, 370 F.3d 1108 (Fed. Cir. 2004) (*citing* <u>Copperweld Corp. v. United States</u>, 12 CIT 148, 161, 682 F. Supp. 552, 565 (1988)). Indeed, the Commission "typically" uses year-over-year data in its injury analysis. Def.'s Brief at 15; *see also* <u>Nitrogen Solutions Fair Trade Comm. v. United States</u>, 29 CIT 86, 97, 358 F. Supp. 2d 1314, 1325 (2005); <u>Steel Auth. of India v. United States</u>, 25 CIT 472, 477, 146 F. Supp. 2d 900, 907 (2001) (Commission's general practice is "to conduct an annual analysis of the volume and effects of imports over the period of investigation"); <u>Asociacion de Produtores de Salmon y Trucha de Chile AG v. U.S. Int'l Trade Comm'n</u>, 26 CIT 29, 37-38, 180 F. Supp. 2d 1360, 1370 (2002) ("[T]he yearly trend analysis is a permissible method."). The Commission's choice to use year-over-year trends thus was also reasonable, and well within its considerable discretion; and the Foreign Producers' argument to the contrary must fail.

ii. *Significance of Rate of Increase Found by the Commission*

The Commission determined that the 3.8% increase in volume of subject imports and the

4.4% increase in subject import market share during the period of investigation were significant. Final Views at 27.[25]   The Foreign Producers dispute the Commission's finding as to the "significance" of the increases found. Pls.' Brief at 20.  In particular, the Foreign Producers claim that the Commission ignored the relevance of the 4.8% increase in market share that the domestic industry experienced during the period of investigation. Pls.' Brief at 20. According to the Foreign Producers, the Commission thus lacks substantial evidence to support its conclusion. Pls.' Brief at 20.[26]

The Commission's analysis expressly acknowledged the increase in the domestic industry's share of the U.S. market.  But the Commission nevertheless found the increase in volume of subject imports and the increase in subject import market share to be significant.  In reaching that conclusion, the Commission analyzed both the volume of subject imports and market share, in light

---

[25]Specifically, the Commission explained that,

> [d]espite the overall declines in production and shipments from 2007 to 2009, the domestic industry increased its market share during this period by 4.8 percentage points and the market share of subject imports increased by 4.4 percentage points. The increases in market share by the domestic industry and subject imports from 2007 to 2009 came at the expense of the non-subject imports whose market share fell by 9.3 percentage points from 2007 to 2009.

Final Views at 36.

[26]The Foreign Producers criticize the Commission for using the term "significant" instead of "substantial" in its finding of a likelihood of an increase in future volume of imports into the United States. Pls.' Brief at 19-20. However, the Foreign Producers do not claim any attendant harm. In any event, as the Government points out, the legislative history of the statute makes clear that the two terms are not intended to express different legal standards. *See* Def.'s Brief at 27-28 (*citing* Uruguay Round Agreements Act (URAA), Pub. L. No. 103-465 (1994)); *see also* <u>Metallverken</u>, 13 CIT at 1036, 728 F. Supp. at 747 (explaining that the Commission "need not use the precise statutory language in findings as long as the basis for determination is reasonably discernable").

of industry trends.

The Commission found, for example, that substantial imports were already present in the

U.S. market at the beginning of the period of investigation, and had continued to increase. Final

Views at 27.[27] Moreover, U.S. consumption of coated paper was substantially declining during the

period of investigation, yet the subject imports still were able to increase their share of the U.S.

market. Final Views at 26, 30. In fact, from 2007 to 2009, subject imports were "the only source

of increased volume into the U.S. market . . . as both the volumes of the domestic industry's U.S.

shipments and that of non-subject imports declined." Final Views at 26-27. Specifically, towards

the end of the period of investigation, subject import volume increased each month from late 2008

through January 2009. Final Views at 27 n.172.[28] In comparing the increase in subject imports to

domestic production, the Commission found that the ratio of subject imports to U.S. production had

steadily increased from 20.5% in 2007 to 24.8% in 2009. Final Views at 26.

In short, although the domestic industry was able to increase its market share during the

period of investigation, the Commission acknowledged the increase and explained – by reference

to numerous trends and indicators in the U.S. industry – why the increases in subject import volume

and market share were significant. Final Views at 26-27. The Foreign Producers' challenge to the

---

[27]As reported by the Commission, from 2007 to 2009, U.S. consumption declined by 21.3%, while the volume of subject imports in the U.S. market increased by 3.8%. Final Views at 26-27. The Commission also found 2008 to 2009 U.S. consumption to have declined by 14.7%, while subject import volume increased by 8.2%, and subject import market share increased by 3.9%. Final Views at 27-28.

[28]Notably, in September 2008, subject import volume was 30,883 short tons. It continued to increase every month thereafter, until January 2009. In October 2008, subject import volume increased to 37,935 short tons, in November to 44,680 short tons, in December to 39,974 short tons, and, in January 2009, it increased to 46,964 short tons. Final Views at 27 n.172.

sufficiency of the Commission's explanation therefore must be rejected.

### b. Likelihood of Substantially Increased Imports

In addition to determining the significance of the rate of increase, the Commission also must determine whether a rate of increase in imports or market share that has been found to be significant "indicat[es] [a] likelihood of substantially increased imports" into the United States. 19 U.S.C. § 1677(7)(F)(i)(III).   In its determination in this case, the Commission relied on evidence demonstrating the attractiveness of the U.S. market to foreign producers and on evidence of APP's intention to increase its presence in the U.S. market.  Final Views at 28-30.  The Commission also took into account APP's loss of certification by the Forest Stewardship Council ("FSC"), and concluded that it would not be an impediment to APP's ability to increase imports into the United States in the imminent future.  Final Views at 30-31.

The Foreign Producers raise three major challenges to the Commission's determination. Each is addressed below.

### i. *The Attractiveness of the U.S. Market*

The Foreign Producers argue that the Commission's price effects determination incorrectly inferred that higher U.S. prices would "pull more subject imports" into the United States.  Pls.' Brief at 22-23.[29]   The Foreign Producers claim that such an inference is illogical in light of the higher average unit value in the U.S. from 2007 to 2009, which, according to the Foreign Producers, did

---

[29]It is undisputed that prices of subject merchandise are generally higher in the United States than in the PRC or other markets in Asia. *See* Final Views at 29; Pls.' Brief at 22.

not pull more subject imports into the United States. Pls.' Brief at 22.[30]  The Foreign Producers assert that it is therefore "pure speculation" to conclude that higher prices would pull additional imports into the United States in the imminent future. Pls.' Brief at 22.

But the Foreign Producers' argument is premised on a misunderstanding of the Commission's position. The Commission relied on the U.S. market's relatively high prices to establish the attractiveness of the U.S. market to Chinese producers. Final Views at 30. The Commission explained that the United States is a highly attractive market for coated paper producers from the PRC and Indonesia not only because of its higher prices, but also because of its large size and its relative openness, as well as Chinese producers' familiarity with the U.S. market. Final Views at 30. The Commission considered the attractiveness of the U.S. market when it concluded that subject producers "have both the ability and the incentive to increase exports of subject merchandise." Final Views at 30.

Contrary to the Foreign Producers' assertions, the Commission never drew the inference that the Foreign Producers contend would have been erroneous. The Foreign Producers' claim therefore has no basis in fact.

## ii. *Foreign Producer's Behavior*

The Foreign Producers also contest the Commission's assessment of APP's failed relationship with Unisource. Pls.' Brief at 23-24. In finding a likelihood of substantially increased

---

[30]According to the Foreign Producers, exports to the United States increased by only 12,192 tons during the period of investigation. Pls.' Brief at 22-23. In contrast, the Foreign Producers note that exports to other "lower priced" markets increased by 46,913 tons (Europe), 49,442 (Asia), and 126,206 (other). Pls.' Brief at 22-23 (*citing* Staff Report at VII-7 (Table VII-2)).

imports into the United States, the Commission cited evidence of APP's "continuing pattern of behavior" reflecting an interest in increasing its presence in the U.S. market. Final Views at 28-29. This evidence included an affidavit attesting that – after APP lost its account with a major U.S. distributor (*i.e.*, Unisource) – APP made a significant investment to establish its own U.S. distribution network, Eagle Ridge Paper ("Eagle Ridge"), in order to maintain and enhance its profile in the U.S. market. *See* Final Views at 28-29.

The Foreign Producers contend that the Commission's analysis lacks "a solid foundation based on 'currently available evidence,'" and they argue that the analysis fails to draw "logical assumptions and extrapolations flowing from that evidence." Pls.' Brief at 23 (*citing* Matsushita Elec. Indus. Co., 750 F.2d at 933-34). The Foreign Producers assert that APP's failed contract with Unisource undermines the Commission's findings, because – according to the Foreign Producers – the turn of events reflects a "failed effort," rather than a likelihood of substantially increased imports. Pls.' Brief at 23-24.

Anticipating the Foreign Producers' argument, the Commission acknowledged that, taken in isolation, APP's loss of its account with Unisource and other developments "may tend to weigh against a finding of imminent increased import volumes." Final Views at 29-30. However, as the Commission further explained, the evidence indicates that APP's loss of business "did not result in a substantial reduction in the volume of overall subject imports." Final Views at 29-30. Moreover, the loss of business eventually led to APP's successful establishment of a new channel of distribution in the U.S. *See* Final Views at 29.

Given that the Foreign Producers provided no direct evidence of APP's intent, the

Commission had little choice but "to rely on circumstantial evidence from which to infer likely intent." <u>Matsushita Elec. Indus. Co.</u>, 750 F.2d at 933-34. The Commission's conclusion, based on an affidavit describing APP's actions, was rational and supported by substantial record evidence.

### iii. *FSC Certification*

Finally, the Foreign Producers challenge the Commission's conclusion that APP's ability to import into the United States would not be hindered by its lack of certification by the Forest Stewardship Council ("FSC"). Pls.' Brief at 24. In its final determination, the Commission concluded that APP's 2007 loss of FSC certification would not adversely affect its capacity to increase future imports into the United States. Final Views at 30. The Commission based that conclusion principally on the increasing levels of subject imports into the United States from the PRC even after APP lost its FSC certification. *See* Final Views at 30.

The Foreign Producers argue that APP's past ability to import into the United States notwithstanding its loss of FSC certification does not necessarily mean that the loss will not affect its prospects in the future. Pls.' Brief at 25. The Foreign Producers proffered evidence in an attempt to show that FSC certification may become an important factor for purchasers in the future. Pls.' Brief at 24-25.[31]

It is black letter law, however, that Commission findings "will not be overturned merely

---

[31]The Foreign Producers cite to a questionnaire response by Global Paper Solutions noting the growing importance of FSC certification, marketing materials of three petitioners noting the growing demand for FSC-certified products, a list of specific customers that refused to purchase from APP because it was not able to offer FSC-certified coated paper, and a sworn declaration as well as sworn testimony from an APP manager, both to the effect that the combination of the lack of FSC certification and "aggressive attack campaigns by environmental NGO's [*sic*] hinder[] APP's ability to substantially increase shipments to the United States in the future." Pls.' Brief at 24-25.

because the plaintiff 'is able to produce evidence . . . in support of its own contentions and in opposition to the evidence supporting the agency's determination.'" Torrington Co. v. United States, 14 CIT 507, 514, 745 F. Supp. 718, 723 (1990), aff'd, 938 F.2d 1276 (Fed. Cir. 1991) (quoting Hercules, Inc. v. United States, 11 CIT 710, 755, 673 F. Supp. 454, 490 (1987)).  To be sure, the Foreign Producers proffered evidence that contradicts evidence relied upon by the Commission.  However, the production of contrary evidence alone cannot upset a Commission determination.  Moreover, levels of subject imports were not the sole evidence that the Commission cited to support its conclusion.  Questionnaire data cited in the Commission's staff report reference only a single response in which "environmental attributes" were listed as a factor in purchasing decisions.  Conf. Staff Report at II-23.

      As discussed above, it is improper for a court to substitute its judgment for that of the Commission. See, e.g., Torrington Co. v. United States, 16 CIT 220, 226, 790 F. Supp. 1161, 1167 (1992), aff'd, 991 F.2d 809 (Fed. Cir. 1993) ("[I]t is not the Court's function to decide that it would have made another decision on the basis of the evidence.") (citing Matsushita Elec. Indus. Co., 750 F.2d at 936).  Here, the Commission's assessment of the impact of FSC certification on imports is adequately supported by the record, and any necessary weighing of the evidence falls within the Commission's domain.

      The Foreign Producers' challenges to the Commission's findings as to statutory factors (II) and (III) therefore cannot be sustained.

B.  The Commission's Analysis of Effects on Prices
Statutory Threat Factor (IV)

With respect to the price effects[32] of future imports, Congress has instructed the Commission

to consider whether "imports of the subject merchandise are entering [the United States] at prices

that are likely to have a significant depressing or suppressing effect on domestic prices, and are

likely to increase demand for other imports." 19 U.S.C. § 1677(7)(F)(i)(IV).

Here, the Commission concluded that imports from the PRC and Indonesia would likely have

"significant adverse effects on [U.S.] prices in the imminent future." Final Views at 34-35.  In

reaching its conclusion, the Commission noted an apparent relationship between declining prices

for imports from the PRC and Indonesia beginning in the fourth quarter of 2008 and declining prices

for the domestic like product in early 2009.  Final Views at 32.  The Commission concluded that

these relationships, together with significant underselling by importers of coated paper from the PRC

and Indonesia, demonstrated that "subject imports depressed domestic prices at least to some extent

for part of the period under examination." Final Views at 33.

Nevertheless, the Commission did not find *significant* present price depression or

suppression of domestic prices, because it could not ascertain whether the imports at issue

contributed significantly to the adverse price effects that occurred throughout the remainder of the

period of investigation. Final Views at 33.[33] The Commission's inability to determine whether the

---

[32]"Price effects" are the degree to which subject imports *depress* prices (*i.e.*, force prices
down) or *suppress* prices (*i.e.*, prevent prices from rising) in the domestic market.

[33]The Foreign Producers argue that – in light of the Commission's findings in its negative
*present* material injury determination (*i.e.*, the findings that imports had not *significantly* suppressed
or depressed domestic prices during the period of investigation) – the Commission's affirmative

effect of imports on domestic prices was significant was in light of two other market factors that contributed to the adverse effects on domestic prices, particularly in later 2009 – specifically, the significant declines in consumption in the U.S. market and the "black liquor tax credit," which effectively lowered domestic producers' input costs. Final Views at 33.[34]

In contrast, the Commission's threat of material injury analysis found that market factors other than the subject imports would not have the same price suppressing or depressing effects in the imminent future that they had during the period of investigation. Final Views at 34. [[ ]] in domestic U.S. consumption in [[        ]] were projected to be modest compared to the 14.7% drop in U.S. consumption between 2008 and 2009. *See* Final Views at 27; *see also* Conf. Final Views at 48, 44.[35]  In addition, the black liquor tax expired in 2009 and was unlikely to be renewed in the imminent future. *See* Final Views at 34-35. The Commission evaluated these likely changes

_____

*threat* of material injury finding (*i.e.*, the finding that a significant effect on domestic prices is likely in the imminent future) cannot be sustained. Final Views at 37-39. Specifically, the Foreign Producers assert that the Commission found that there was "insufficient evidence to find that subject imports had any current adverse price effects." Pls.' Brief at 26-27. To the contrary, what the Commission actually said was that subject imports "depressed domestic prices at least to some extent for part of the period under examination." Final Views at 33, 37. The Commission further explained that it was unable to find *significant* present price effects that were attributable to coated paper imports from the PRC and Indonesia because "other factors that were occurring in the U.S. market likely also contributed importantly to lower prices." Final Views at 33. There is thus no truth to the Foreign Producers' assertion that the Commission found that subject imports had *no* current adverse price effects.

[34]In 2009, certain U.S. paper mills applied for and received an alternative fuel tax credit, known as the "black liquor tax credit," which allowed producers to receive a tax credit of $.50 per gallon of kraft pulp by-product (or "black liquor") that they produced. The tax credit, which went into effect in late 2007, expired at the end of 2009. *See* Final Views at 25; *see also* Staff Report at V-2.

[35]Domestic consumption was projected to decline by [[        ]]% from 2010 to 2011, and by [[    ]] in 2012. Conf. Final Views at 55.

in conditions of competition while taking into account the likely continued increases in subject import volume and the predominant underselling by imports from the PRC and Indonesia. Final Views at 35. In light of these evaluations, the Commission found that the causal relationship between falling domestic prices and increased volumes of subject imports sold at lower prices, observed during late 2008 and early 2009, would likely be reestablished. Final Views at 34. The Commission therefore concluded that the subject imports would likely have significant adverse price effects in the imminent future. Final Views at 35.

The Foreign Producers raise three challenges to the Commission's finding as to the subject imports' adverse effects on domestic pricing. *See* Pls.' Brief at 26-36. First, the Foreign Producers claim that the Commission's finding is not supported by substantial evidence. *See* Pls.' Brief at 27-32; section III.B.1, *infra*. Second, the Foreign Producers argue that the Commission failed to address two of their arguments from the underlying investigation, which the Foreign Producers claim undercut the Commission's finding. *See* Pls.' Brief at 32-33; section III.B.2, *infra*. Finally, the Foreign Producers dispute the Commission's price effects findings as contrary to law, asserting that the Commission failed to take into account "other relevant economic factors." *See* Pls.' Brief at 33-36; section III.B.3, *infra*. Each of these challenges is addressed, in turn, below.

### 1. Substantial Evidence Determination

To determine the likely future effects of import prices on the U.S. market, the Commission analyzed, among other factors, the level of underselling by importers in the United States. *See* Final Views at 31, 34. In its analysis, the Commission found predominant underselling by importers of coated paper from the PRC and Indonesia during the period of investigation, when the imports at

issue undersold the domestic like product in 48 out of 58 comparisons.  Final Views at 31.

The Foreign Producers do not dispute the fact that subject imports undersold domestic like products during the period of investigation.  Pls.' Brief at 28.  Instead, the Foreign Producers claim that the Commission's findings on underselling failed to explain the Commission's greater reliance on 2009 data, relative to data for 2010.  According to the Foreign Producers, 2009 data was inappropriate due to the effects of recession.  Pls.' Brief at 28-29.  The Foreign Producers also argue that the Commission did not adequately explain how the absence of market factors – which depressed prices in 2009 – will affect future domestic prices.  Pls.' Brief at 28-29.  Absent such explanation and justification, the Foreign Producers contend that the Commission's affirmative threat of injury determination is not supported by substantial evidence.

The Foreign Producers' challenge to the Commission's reliance on 2009 data is unfounded.  Contrary to the Foreign Producers' assertions, the Commission explained its decision to give greater weight to data from 2009 (as compared to data for 2010).  The Commission noted that the 2010 pricing data demonstrated uncharacteristic changes after provisional duties were imposed on subject imports as a result of Commerce's affirmative preliminary determinations.  Final Views at 27, 37.  Those uncharacteristic changes are documented in the Commission's staff report, which presented data for 2009 and 2010 collected from questionnaire responses.  *See* Conf. Staff Report at V-9, V-12, V-20 (Tables V-1, V-4, V-7).  The 2009 data – unlike the 2010 data – reflected trends comparable to data from 2007 and 2008.

For example, the data documented the quantity of imports sharply dropping and prices

[[      ]] in 2010. *See* Conf. Staff Report at V-9, V-12, V-20 (Tables V-1, V-4, V-7).[36]  In addition,

the staff report reflected [[          ]] underselling by Chinese imports in the United States through

2009, followed by a [[              ]] in underselling in 2010. *See* Staff Report at V-10 (Table V-7);

*see also* Final Views at 27 n.174 (noting that Commerce's preliminary determination issued on

March 9, 2010).[37]  Even though 2009 was marked by a recession, the Commission's explanation –

supported by the record – refutes any suggestion that it was error for the Commission to rely on data

from 2009. As indicated in the Commission's final views, the trends from 2009 corresponded more

closely to past trends than those from 2010. The Foreign Producers' assertion that the Commission

failed to explain why 2009 data is more relevant than 2010 data is therefore without merit. Pls.'

Brief at 28-29.[38]

Moreover, as discussed above, 19 U.S.C. § 1677(7)(I) supports the Commission's decision

to give reduced weight to data collected after the commencement of the trade investigations. *See*

---

[36]For example, the number of instances of underselling for products 1 to 5 from 2007 to 2009 ranged between 14 and 15, while there were only four instances in 2010. Staff Report at V-10 (Table V-7). The quantity of imports in 2010 was also dramatically lower than any previous year. Staff Report at V-10 (Table V-7).

[37]As reported, the underselling margin for January to March of 2010 for [[                ]] products was at least [[    ]]%. *See* Conf. Staff Report at V-9 (Table V-1), V-11 (Table V-3), V-12 (Table V-4); *see also* Conf. Def.'s Brief at 31 n.8. In comparison, the underselling margin for March to June 2010, after the institution of the trade cases, was [[        ]]. *See* Conf. Staff Report at V-9 (Table V-1), V-11 (Table V-3), V-12 (Table V-4).

[38]The Foreign Producers claim that the "natural premium" afforded to domestic producers in 2010 limited the underselling margin for that period. Pls.' Brief at 29. The Foreign Producers further contend that the Commission failed to consider that limited underselling in its determination. Pls.' Brief at 29. However, as discussed above, the Commission was under no obligation to base its findings on data for 2010. *See* section III.B.1, *supra*. The fact that the Commission did not discuss 2010 underselling was inconsequential to the Commission's ultimate conclusion.

section III.A.2.a.i, *supra*; Corus Staal BV v. U.S. Int'l Trade Comm'n, 27 CIT 459, 470 (2003),

*aff'd*, 85 F. App'x 772 (Fed. Cir. 2004) ("The Commission, having found that changes in subject

import volume, price effects, and impact were related to the pendency of the investigations, acted

within its discretion in discounting post-petition data.") (*citing* 19 U.S.C. § 1677(7)(I)); *see also*

Nucor Corp. v. United States, 414 F.3d 1331, 1336 (Fed. Cir. 2005) ("[I]t was reasonable for the

Commission to interpret the statutory language to permit it to accord different weight to imports

during different portions of the period of investigation depending on the facts of each."). The

Commission's reliance on 2009 data thus does not render its determination unsupported by

substantial evidence. The Commission not only provided a reasonable explanation for its decision,

but also acted within its statutory authority in according less weight to the data from 2010. *See*

American Lamb Co. v. United States, 785 F.2d 994, 1004 (Fed. Cir. 1986) (explaining that court's

role is to ascertain whether there was a "sufficiently reasonable" basis for determination).

Similarly unavailing is the Foreign Producers' challenge to the Commission's conclusion

as to the future impact of certain market factors on domestic prices. In its determination, the

Commission found that import volume would become a "key factor" in domestic prices in the

absence of market factors that depressed prices in 2009. Final Views at 34. The Foreign Producers

counter that "simple logic" suggests that, with the disappearance of the market factors that depressed

domestic prices during the period of investigation (*i.e.*, decreasing consumption and increasing pulp

production due to the black liquor tax credit), domestic prices will increase. Pls.' Brief at 29-30.

The Foreign Producers further assert that this "simple logic" refutes the Commission's conclusion

that future imports will have a negative effect on domestic prices. Pls.' Brief at 29-30. According

to the Foreign Producers, the Commission failed to set forth a "reasoned explanation" for its conclusion, rendering its determination unsupported by substantial evidence. Pls.' Brief at 31 (*citing* U.S. Steel Group v. United States, 25 CIT 1046, 1047, 162 F. Supp. 2d 676, 678 (2001)).

In its determination, the Commission explained that domestic prices are not expected to increase notwithstanding the absence of the 2009 market factors. Final Views at 34-35. The Commission reasoned that the projected U.S. demand for coated paper will be insufficient to absorb the likely increased imports of coated paper from the PRC and Indonesia at less than fair market value. Final Views at 34-35.[39] Accordingly, domestic competition would be likely to increase. Final Views at 34. The Commission concluded that, in such a climate, subject imports would continue to undersell domestic like products through aggressive pricing to gain market share in the United States and, in doing so, would significantly affect domestic prices. *See* Final Views at 33-34 (establishing that underselling by subject imports will "likely increase the attractiveness of those imports to domestic purchasers").[40]

The Commission also noted that unfairly priced subject imports led domestic prices downward in late 2008 and 2009. Final Views at 34. The questionnaire responses received by the Commission support the Commission's conclusion, reporting price as "an important consideration in purchasing decisions." Final Views at 31. Under these circumstances, the Commission reasonably determined that, absent negative market factors, an increase in subject import volume

---

[39]For a discussion of the Commission's determination concerning the likelihood of increased future imports, *see* section III.A.2.b, *supra*.

[40]The Commission cited statements made by domestic producers indicating that they were "forced to lower prices . . . to compete with the bulk of the imports and the resulting depressed pricing structure." Final Views at 32 n.213.

would likely lead to significant underselling and price suppression within the foreseeable future. Final Views at 34-35.

The Foreign Producers further claim that the Commission erred by relying on evidence of increased volume of subject imports in its analysis of price effects. Pls.' Brief at 30-31. The Foreign Producers assert that the statute requires a price effects determination to be based on actual current pricing data, rather than increased volumes of imports. Pls.' Brief at 30-31; *see* 19 U.S.C. § 1677(7)(F)(i)(IV). In support of their argument, the Foreign Producers point to the statutory language, which directs the Commission to consider whether "imports of the subject merchandise are entering at prices that are likely to have a significant" adverse effect on domestic prices. Pls.' Brief at 27 (*quoting* 19 U.S.C. § 1677(7)(F)(i)(IV)). However, the language of the statute does not preclude the Commission from examining prices of merchandise entering the United States in the context of the industry's vulnerability to imports. *See* 19 U.S.C. § 1677(7)(F)(i)(IV). In fact, the statute directs the Commission to consider the factors "as a whole" in making a determination. *See* 19 U.S.C. § 1677(7)(F)(ii). There is nothing to indicate that the Commission's consideration of increased volume in its price effects analysis was not in accordance with the statutory scheme. The Foreign Producers' challenges to the substantiality of the evidence supporting the Commission's finding are without merit.

## 2. The Foreign Producers' Other Arguments

The Foreign Producers contend that, once the Commission determined that the market factors that were present in 2009 were going to be absent in 2010 and 2011, the Commission had an obligation to recognize the Foreign Producers' arguments in relation to 2007 and 2008 – a period

which did not experience the 2009 market factors. Pls.' Brief at 32-33. The Foreign Producers claim that the Commission failed to do so, and that the Commission's determination is therefore not in accordance with law, because the Commission "did not satisfy the statutory requirement to include 'an explanation of the basis for its determination that addresses relevant arguments' by the parties." Pls.' Brief at 32  (*quoting* 19 U.S.C. § 1677 f(i)(3)(B)). [41]

Notably, "[t]here is no statutory requirement that the Commission respond to each piece of evidence presented by the parties." Garanges Metallverken, AB v. United States, 13 CIT 471, 477, 478-79, 716 F. Supp. 17, 24 (1989) (citations omitted). [42] "[T]he fact that certain information is not discussed in a Commission determination does not establish that the Commission failed to consider that information." Timken U.S. Corp., 421 F.3d at 1355-56 (*citing*  Nat'l Ass'n of Mirror Mfrs., 12 CIT at 779-80, 696 F. Supp. at 648-49). Rather, "the Commission need only discuss 'material issues of law or fact.'" Timken U.S. Corp., 421 F.3d at 1355-56 (*citing*  Nat'l Ass'n of Mirror Mfrs., 12

---

[41]19 U.S.C § 1677f(i)(3)(B) provides, in relevant part, that:

. . . the Commission shall include in a final determination of injury an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties who are parties to the investigation or review (as the case may be) concerning volume, price effects, and impact on the industry of imports of the subject merchandise.

19 U.S.C § 1677f(i)(3)(B).

[42]The Statement of Administrative Action ("SAA") acknowledges that "existing law does not require that an agency make an explicit response to every argument made by a party, but instead requires that issues material to the agency's determination be discussed, so that the 'path of the agency may reasonably be discerned' by a reviewing court." SAA at 4215; *see, e.g.,* Ceramica Regiomontana, S.A. v. United States, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("A court may 'uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned.'") (citations omitted).

CIT at 779-80, 696 F. Supp. at 648-49). Here, the Foreign Producers have failed to show how their

two arguments in relation to data from 2007 and 2008, made in the underlying investigation and not

discussed by the Commission in its final views, are so "material" that it was error for the

Commission not to specifically address them.

The Foreign Producers' first argument from the underlying investigation was that domestic

prices increased during 2007 and 2008 despite the underselling by subject imports. According to

the Foreign Producers, that fact constitutes evidence that domestic prices would not be adversely

impacted by subject imports in the imminent future. Pls.' Brief at 32. The Foreign Producers'

second argument asserted that the margins of underselling in 2007 and 2008 were largely consistent

with the natural premium afforded to domestic products. According to the Foreign Producers, this

demonstrates the absence of adverse price effects in the imminent future by reason of subject

imports. Pls.' Brief at 32.[43]

In arguing that both of these issues should have been addressed in the Commission's final

views, the Foreign Producers emphasize that – much like the period of time for which the

Commission is projecting a threat of injury – during 2007 and 2008, U.S. consumption did not

decrease and the black liquor tax credit was not a factor (because, in 2007 and 2008, domestic

producers generally were not yet taking advantage of the tax credit). Pls.' Brief at 32-33. The

Foreign Producers reason that, because subject imports did not adversely affect domestic prices

---

[43]As the Commission's staff report explained, "U.S. producer New Page reported that historically it was able to receive a premium of $40 to $60 per ton." Final Views at 31. "A premium of $40-$60 per ton is approximately equivalent to a premium of 4 to 6 percent of pricing product 1 and 4 and approximately equivalent to a premium of 3 to 5 for pricing product 3." Final Views at 31; *see also* Staff Report at V-10.

between 2007 and 2008, it follows that they will likely not affect domestic prices in the imminent future. Pls.' Brief at 32.

However, the Foreign Producers' argument fails to recognize significant differences between the two periods. First, the Foreign Producers assume that import volume during 2007 and 2008 was similar to the projected volume in the imminent future. Pls.' Brief at 32. But, as the Government counters, the Foreign Producers' focus on the increase in domestic prices during 2007 and 2008 "disregards that subject import volume was lower, and increasing less rapidly, during 2007 and much of 2008 than in 2009." Def.'s Brief at 35. In addition, as the Domestic Producers note, the domestic industry was not able to increase prices in 2007 and 2008 sufficiently to cover rising production costs, because the industry experienced a "cost-price squeeze." Def.-Ints.' Brief at 35 n.18.[44] The price increase during 2007 and 2008 thus does not undermine the Commission's conclusion that underselling would likely impact domestic prices.

Further, the Foreign Producers' second argument, which deals with underselling margins in 2007 and 2008, does not comport with the evidence. Specifically, the record reflects an underselling margin for 2007 that exceeded the highest natural premium reported. *See* Staff Report at V-10 (Table V-7).[45] As for 2008, although the underselling margin was smaller than that of 2007, it still exceeded the natural premium afforded to domestic products. *See* Staff Report at V-10 (Table V-

---

[44]A cost-price squeeze occurs when the cost of goods sold ("COGS") exceeds price and the producer is unable to raise the price – that is, when the producer is unable to sell the good for more than it costs to produce it. *See* Nippon Steel Corp., 458 F.3d at 1354 n.4. *But see* n.43, *supra* (discussing historical natural premiums reported).

[45]According to data submitted in response to Commission questionnaires, the 2007 average margin of underselling for products 1 to 5 was 11.0%. Staff Report at V-10 (Table V-7).

7).[46]

Although there are some similarities between 2007/2008 and the relevant period for which the Commission is projecting a threat of injury, the differing industry conditions preclude the Foreign Producers' attempts to directly correlate the two. The Foreign Producers have pointed to no concrete evidence to discredit the Commission's determination as to the impact of imports on future U.S. prices. Particularly in light of these circumstances, the Commission was under no obligation to specifically discuss the Foreign Producers' arguments from the underlying investigation.

### 3.  Other Relevant Economic Factors

The Foreign Producers further contend that the Commission ignored "other relevant economic factors" that it was obligated to consider under 19 U.S.C. § 1677(7)(F)(i).[47] In particular,

---

[46]Data submitted in response to Commission questionnaires indicate that the 2008 average margin of underselling for products 1 to 5 was 9.2%. Staff Report at V-10 (Table V-7). Even examining in isolation products 1 and 4 [[

]], the underselling margins still exceeded the average natural premiums afforded to domestic products in most quarters analyzed by the Commission. *See* Conf. Staff Report at V-9 (Table V-1), V-12 (Table V-4); *see also* Final Views at 32. Further, record evidence shows that 2009 and the first quarter of 2010 (the most recent period for which data were collected) [[

]]. *See* Conf. Staff Report at  V-9 (Table V-1), V-11 (Table V-3), V-12 (Table V-4).

[47]19 U.S.C. § 1677(7)(F)(i) provides, in relevant part:

In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of the subject merchandise, the Commission shall consider, *among other relevant economic factors . . .*

19 U.S.C. § 1677(7)(F)(i) (emphasis added).

the Foreign Producers argue that the Commission ignored the role of prices for pulp (the key component in the production of paper) in the Commission's explanation of price trends, and that the Commission failed to explain why pricing data for the paperboard segment of the industry was not included in its underselling findings. Pls.' Brief at 33-34.

In its determination of a threat of material injury, the Commission did not explicitly consider the impact of pulp prices on the domestic industry's prices – in part because the data collected during the period of investigation reflected the black liquor tax credit and other market factors that, according to the Commission, made it impossible to gauge the effects of pulp prices alone on domestic prices. Final Views at 33. The Foreign Producers argue that, in the absence of other evidence illuminating the effect of pulp prices on the domestic industry, the Commission should have considered the econometric model submitted by the Foreign Producers during the underlying investigation, as a measure of the effect of pulp prices on the domestic industry. Pls.' Brief at 33-34.[48] The Foreign Producers maintain that the econometric model "documented the relative contribution of changing pulp prices and demand, compared to subject imports." Pls.' Brief at 33-34.

The Commission determined that the Foreign Producers' econometric model was inadequate for use in determining the impact of pulp prices on domestic prices of coated paper, because the model provided limited data. The model failed to account for the relationship between pulp prices and domestic coated paper prices in the imminent future. Def.'s Brief at 35.

---

[48]The econometric model was submitted by the respondents in the underlying investigation. Only three of the five respondents are plaintiffs in this litigation. Moreover, two of the plaintiffs in this litigation were not respondents in the underlying investigation. Nevertheless, for ease of reference, the econometric model is referred to herein as the Foreign Producers' model.

The Foreign Producers originally proffered their econometric model to rebut a model that the Domestic Producers had introduced for purposes of the analysis of *present* material injury. *See* Staff Report at V-12; *see also* Def.'s Brief at 35. The Foreign Producers' model was therefore designed to attempt to explain the historical impact of the price of pulp on U.S. profit margins during the period of investigation, for purposes of the Commission's *present* material injury analysis. *See* Def.'s Brief at 35 (*citing* Conf. Respondent Post-Hearing Brief, C.R. Doc. 320 at 1). The Foreign Producers' model was not designed to do projections concerning the price of pulp and other factors *in the future. See* Def.'s Brief at 35; *see also* Staff Report at V-11 – V-12. Among other things, the model did not take into account the manner in which certain market factors would affect domestic prices in the imminent future. Def.'s Brief at 35-36. As such, the Foreign Producers' econometric model was of little value to the Commission in its analysis of a future threat of material injury.

In addition, the Foreign Producers' model was based on pricing data from a particular firm, not the entire industry. Def.'s Brief at 36 n.10. This is particularly important because, as the Government notes, domestic producers did not face uniform cost trends with respect to pulp. Def.'s Brief at 36; *see also* Final Views at 25 n.162. A model based on one firm's pulp costs would not be representative of all producers in the industry. Given these limitations, the Commission's decision to disregard the Foreign Producers' model in the Commission's threat of material injury analysis was not unreasonable. *See* U.S. Steel Group v. United States, 18 CIT 1190, 1224, 873 F. Supp. 673, 703 (1994), *aff'd*, 96 F.3d 1352 (Fed. Cir. 1996) (noting Commission's discretion in interpreting data).

The Foreign Producers also claim that the Commission ignored "pricing data trends for the

*paperboard segment* of the total industry, and how that data affected conclusions about the overall industry." Pls.' Brief at 34.[49]   The Foreign Producers contend that the Commission's underselling analysis failed to take into account paperboard companies that were included in the scope of the "domestic industry" after the Commission had collected pricing data from a sample of domestic producers. Pls.' Brief at 34-35. The Foreign Producers maintain that the Commission's underselling finding therefore is not representative of the industry as a whole. Pls.' Brief at 34-35.

In particular, the Foreign Producers argue that the Commission's addition of the paperboard companies into the "domestic industry" nearly doubled the size of the industry and, as such, that the Commission's findings had no relevance for almost half of the domestic industry. Pls.' Brief at 34-35.[50]   The Foreign Producers submit that, because none of the domestic paperboard producers sold the types of coated paper products for which product-specific data had been obtained by the Commission, the underselling findings based on such data were irrelevant for the paperboard section of the industry. Pls.' Brief at 35.   In addition, the Foreign Producers highlight the fact that the paperboard segment of the industry enjoyed a stronger profitability margin than the rest of the industry over the period of investigation. Pls.' Brief at 35-36.

---

[49]In the Commission's final determination, paperboard products were included in the scope of the Commission's investigation. Final Views at 4-5.

[50]The Foreign Producers' assertion that the inclusion of the paperboard companies nearly doubled the size of the domestic industry is not an accurate characterization of the facts. Pls.' Brief at 35. As the staff report shows, domestic coated paper production before the inclusion of the paperboard companies was calculated to be 999,459 tons in 2009. Staff Report at C-4 (Table C-1). After the paperboard companies were included, the total production of domestic coated paper was calculated to be 1,477,233 tons. *See* Staff Report at IV-11 (Table IV-6). Including companies that produced paperboard in the scope of the domestic industry thus did not result in a doubling of the size of the domestic industry; it resulted in an increase of less than 50%.

The Foreign Producers, however, make it clear that they are not contesting the Commission's definition of the domestic industry or the lack of usable pricing data for paperboard companies. Pls.' Brief at 35. Instead, the Foreign Producers contend that the Commission failed to explain how underselling findings from an earlier time period that apply to a subset of U.S. production "constitute 'substantial evidence' of 'imminent' and 'significant' price effects from future subject imports." Pls.' Brief at 35.

Essentially, the Foreign Producers seek to discredit the sample that the Commission relied on in its finding of underselling by imports from the PRC and Indonesia. As the Domestic Producers note, however, the Foreign Producers failed to properly raise this issue before the Commission in the course of the underlying investigation. Def.-Ints.' Brief at 37-38 (*citing* Diamond Sawblades Manuf. Coal. v. United States, 612 F.3d 1348, 1362 (Fed. Cir. 2010) (concluding that "isolated statements" made in a party's pre- and post-hearing briefs to the Commission during an investigation concerning an issue "are simply not enough to indicate that [a party] effectively presented [the] issue to the Commission")).

The Foreign Producers had ample opportunity in the course of the investigation to raise any concerns they may have had about the adequacy of sampling and the data sought by the Commission. For example, the Commission circulated drafts of questionnaires to all parties, and invited all to comment. Def.-Ints.' Brief at 38 (*citing* Commission's Notice: Scheduling of Final Phase of Investigations, P.R. Doc. 106). The Foreign Producers submitted extensive comments to the Commission, totaling 278 pages. Def.-Ints.' Brief at 38 (*citing* Respondents' Comments on Draft Questionnaires, P.R. Doc. 110). In those very detailed comments, the Foreign Producers asked

the Commission to send producer questionnaires to eight additional paperboard companies. Def.-Ints.' Brief at 38. However, the Foreign Producers' comments failed to request pricing data for paperboard products. Def.-Ints.' Brief at 38. Even after the pre-hearing staff report issued (which contained the same pricing data as the final report), the Foreign Producers failed to raise any concerns about the sufficiency of the pricing data. Def.-Ints.' Brief at 38-39. The Foreign Producers thus failed to exhaust their administrative remedies. They cannot now be heard to complain that the Commission did not address issues that the Foreign Producers themselves failed to raise before the Commission in a timely fashion.

Moreover, the fact that the Commission did not provide an explanation for its pricing data sample does not, in itself, render the Commission's underselling finding not supported by substantial evidence. Pls.' Brief at 35. During the Commission's investigation, the parties agreed that the Commission should not divide the domestically-produced merchandise into multiple domestic like products. Final Views at 6. In fact, the Commission concluded that paperboard products and coated paper products are "broadly interchangeable in the marketplace." Final Views at 6-7. Since the Commission determined that there were no "bright lines" between coated paper and paperboard, the Commission had no reason to believe that the data collected before the paperboard companies were added to the domestic industry were not usable data. Further, after the paperboard producers were identified and made part of the domestic industry, the pricing data collected by the Commission still covered more than half of the identified domestic producers. *See* Staff Report at I-3 – I-4.

Given the agreement that paperboard products are interchangeable with coated paper products, it was incumbent on the Foreign Producers to raise the issue of sampling with the

Commission if they were dissatisfied. Under the circumstances, the Commission had no affirmative obligation to explain its choice of pricing data in the sample. "The burden of 'show[ing] that the sample relied on by the Commission was not representative' falls on the party challenging that sample, and '[g]eneral allegations that the [market at issue] is not homogenous and that small samples consequently yield skewed results are insufficient to meet this burden.'" Nucor Fastener Div. v. United States, 35 CIT ____, ____, 791 F. Supp. 2d 1269, 1288 (2011) (quoting U.S. Steel Group v. United States, 96 F.3d 1352, 1366 (Fed. Cir. 1996)).

As discussed above, the Foreign Producers never challenged the Commission's sampling during the course of the administrative proceedings. The Commission therefore was not required to explain why the sample that it relied on for its underselling finding did not include paperboard companies – a product within the scope of the domestic industry. The burden to raise such a challenge lies with the party challenging the sample; and the issue must be first raised with the Commission, before it can be raised in this forum.

In sum, none of the Foreign Producers' arguments discussed above seriously calls into question any aspect of the Commission's determination as to statutory factor (IV).

## C. The Commission's Analysis of Causation
### Statutory Threat Factor (IX)

In its threat of material injury determination, the Commission is required to ensure that the threat of material injury found in its analysis is attributable to the subject imports rather than other sources of injury. Statutory threat factor (IX) requires that any "adverse trends" for the domestic

industry be "by reason of subject imports." 19 U.S.C.§ 1677(7)(F)(i)(IX).[51]

In analyzing the threat of material injury here, the Commission found that – due to the projected declines in U.S. consumption of coated paper – the U.S. market could not accommodate the likely future growth in imports from the PRC and Indonesia without material injury to the domestic industry. Final Views at 38. The Commission's ultimate injury determination relied, in part, on the vulnerable condition of the domestic industry found by the Commission. Final Views at 38.

In determining that the U.S. industry was in a vulnerable condition, the Commission specifically cited double-digit percentage declines from 2007 to 2009 in production, capacity utilization, U.S. shipments, employment, and capital expenditures. Final Views at 38. The domestic industry's operating income decreased during each of the full years investigated, and its operating income as a ratio of net sales fell from 7.4% in 2007 to 4.9% in 2008, and then to 3.8% in 2009. Final Views at 37. The Commission noted that, in the first half of 2010, when subject imports had largely exited the U.S. market, the domestic industry increased production, shipments, and capacity utilization, but its operating ratio was slightly lower than in interim 2009 and its ratio of cost of goods sold ("COGS") to net sales was higher. Final Views at 37. In light of its vulnerable condition and the Commission's other findings in relation to price and volume, the Commission determined that the domestic industry would likely experience future declines in employment, sales, and profitability. Final Views at 38-39.

---

[51] 19 U.S.C.§ 1677(7)(F)(i) provides, in relevant part, that "the Commission shall consider, among other relevant economic factors . . . (IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time)."

In determining whether the threat of future material injury was significantly attributable to coated paper imports from the PRC and Indonesia, the Commission considered whether there were other factors that would likely have an imminent impact on the domestic industry. Final Views at 38-39. In its causation analysis, the Commission noted the modest projected declines in U.S. consumption of coated paper, but explained that – while demand trends were likely to limit the domestic industry's ability to increase sales and prices – their likely impact on the domestic industry would not be of such magnitude as to render insignificant the likely adverse effects of the imports at issue. Final Views at 38. The Commission also examined imports from sources other than the PRC and Indonesia. Final Views at 39. The Commission observed that such non-subject imports lost market share between 2007 and 2009, and were generally priced higher than the subject imports. Final Views at 39. The Commission concluded that – if the provisional duties that had been imposed on imports from the PRC and Indonesia were lifted – imports from the PRC and Indonesia would compete on price to regain the market share that they lost to both the domestic industry and non-subject imports in interim 2010. Final Views at 39.

The Foreign Producers attack the Commission's causation analysis on two fronts. The Foreign Producers first claim that the Commission lacked substantial evidence to support its conclusion that the domestic industry is vulnerable to injury from Chinese and Indonesian coated paper imports. Pls.' Brief at 36-38; *see* section III.C.1, *infra*. In addition, the Foreign Producers contend that the Commission failed to ensure that its finding of a threat of material injury did not attribute injury from other market sources to imports of coated paper from the PRC and Indonesia. Pls.' Brief at 38-42; *see* sections III.C.2 & III.C.3, *infra*. Each of the Foreign Producers' main

arguments is addressed below.

### 1. The U.S. Industry's Vulnerability

The Commission's threat of material injury determination rests on its conclusion that future material injury would be significantly attributable to coated paper imports from the PRC and Indonesia. Here, the Commission's attribution of injury determination was based in part on the Commission's conclusion that the U.S. industry was vulnerable to material injury. Final Views at 38. The Foreign Producers claim that the Commission's vulnerability conclusion is not supported by substantial evidence on the record. Pls.' Brief at 36-38. In seeking to make their case, the Foreign Producers emphasize the fact, found by the Commission, that the "domestic industry remained profitable and steadily increased its market share" during the period of investigation. Pls.' Brief at 36-37 (*quoting* Final Views at 37-38). With respect to the domestic industry's market share growth, the Foreign Producers assert that the Commission failed to explain why an industry that has increased its share of the market every year constitutes an industry in a "weakened state." Pls.' Brief at 37 (*citing* Final Views at 38). The Foreign Producers point to an alleged increase in the U.S. industry's operating profits in 2009. Pls.' Brief at 37. They claim that, because of the black liquor tax credit that U.S. producers received in 2009, the U.S. industry experienced an increase in operating profits. Pls.' Brief at 37. In light of such findings, the Foreign Producers argue that the U.S. industry could not reasonably be considered to be in a vulnerable condition in the first half of 2010. Pls.' Brief at 37. According to the Foreign Producers, "[n]o longer having the ability to enjoy surplus profits . . . is not the same as being in a 'weakened state.'" Pls.' Brief at 37. The Foreign Producers maintain that the domestic industry's allegedly higher operating profit in 2009 is evidence

that the domestic industry was not in a weakened or vulnerable state. Pls.' Brief at 37-38.

It is true that, in its vulnerability analysis, the Commission acknowledged the domestic industry's increase in market share during the period of investigation. *See* Final Views at 36. But that fact alone does not suffice to undercut the Commission's vulnerability finding. *See* Final Views at 36. In an analysis of a threat of material injury, the Commission is instructed to analyze the relevant economic factors "as a whole." *See* 19 U.S.C. § 1677(7)(F)(ii) (providing that "[t]he presence or absence of any factor which the Commission is required to consider . . . shall not necessarily give decisive guidance with respect to the determination"). In its review of the U.S. industry, the Commission found a downward trend in virtually all of the industry's performance indicators.[52] According to the Commission, "the domestic industry suffered double-digit percentage declines in production, shipments, capacity utilization, net sales, production workers, operating income and capital expenditures." Final Views at 38. Further, the Commission highlighted evidence indicating that, even in interim 2010, after a majority of subject imports left the U.S. market due to the institution of the trade cases, some of the domestic industry's performance indicators continued to decline. *See* Final Views at 38.[53] In light of the multiple market indicators

---

[52]According to the Commission's staff report, U.S. consumption of coated paper fell by 21.3% during the period of investigation, domestic industry production declined by 14.4%, capacity utilization decreased by 11.7%, and shipment quantity shrank by 15.0%. Final Views at 35-36. Labor metrics also decreased; employed production-related workers decreased by [[  ]]%, hours worked decreased by [[  ]]%, and wages paid decreased by [[  ]]%. Conf. Final Views at 52. Finally, the domestic industry's profitability margins narrowed; operating income dropped by 57% from 2007 to 2009 and operating income as a ratio of net sales decreased while the COGS to net sales ratio increased. *See* Conf. Final Views at 52-53; *see also* Staff Report at C-7 (Table C-3); Def.-Ints.' Brief at 40.

[53]For example, the domestic industry's COGS to net sales ratio continued to increase as the number of production workers and operating margins continued to decline. Final Views at 38.

cited by the Commission, the fact that the domestic producers' share of the U.S. market increased

is, in and of itself, not enough to render the Commission's determination unsupported by substantial

evidence.

The Foreign Producers also claim that operating income for the U.S. industry had increased

in 2009, which – according to the Foreign Producers – casts doubt on the Commission's conclusion

that the U.S. market was in a vulnerable state. Pls.' Brief at 37. However, the Foreign Producers'

claim that operating income had increased is inconsistent with the Commission's finding. *See* Pls.'

Brief at 37; Final Views at 37. According to the Commission, "the domestic industry experienced

positive, but declining operating income in each year of the period examined, falling from $144.0

million in 2007 to $95.1 million in 2008 and $61.8 million in 2009." Final Views at 37; *see* Staff

Report at C-7 (Table C-3) (reporting a decline in operating income by 57.1% from 2007 to 2009).

In their principal brief, the Foreign Producers provide a table that appears to show that the domestic

industry had increased operating income in 2009. Pls.' Brief at 37. But the Foreign Producers' table

depicts a 2009 trend in operating income for the domestic industry that is at odds with the trend

discerned by the Commission, because the Foreign Producers used a different method of calculating

operating income. Pls.' Brief at 37.

In calculating the domestic industry's operating income for 2009, the Foreign Producers

included the black liquor tax credit that the U.S. industry received that year. *See* Pls.' Brief at 37.

In contrast, the Commission's calculation did not include the black liquor tax credit as part of the

domestic industry's operating income. Instead, the Commission classified the tax credit as a

separate "other" (non-operating) income item. *See* Staff Report at VI-4 (Table VI-I n.1). As a result

of this methodological difference, the Commission's calculation reported lower operating income for the domestic industry than the calculation conducted by the Foreign Producers.

Distilled to its essence, the fundamental issue raised by the Foreign Producers is not whether the Commission failed to account for the domestic industry's surplus profit in the Commission's vulnerability determination, but, rather, whether the Commission had the discretion to exclude the tax credit from its calculation of the domestic producers' operating income. The Commission has discretion to "perform its duties in the way it believes most suitable." U.S. Steel Group, 96 F.3d at 1362. However, in doing so, the Commission may not act arbitrarily. U.S. Steel Group, 96 F.3d at 1362. Here, the Commission's choice of methodology was not arbitrary.

The Commission's decision to exclude the black liquor tax credit from its calculation of the 2009 domestic industry's operating income was both practical and consistent with practice in the industry. Specifically, as the record indicates, domestic producers that received the tax credit did not report it in a uniform manner in their public financial statements; and most did not report it as part of operating income. *See* Conf. Staff Report at VI-39.[54] The Commission's staff report confirms that the black liquor tax credit was not included in the Commission's calculation of the domestic industry's operating income because most of the producers reported that they did not treat it as such. Conf. Staff Report at VI-39 – V-41; Def.'s Brief at 38. Further, because some domestic

---

[54]The staff report detailed how each of the questionnaire respondents classified the tax credit. *See* Conf. Staff Report at VI-39. According to the staff report, with respect to the U.S. producers responding to the Commission's questionnaire and whose public income statement classification has been determined, the tax credit was classified by two of the companies as "other" income and by two others as a direct offset to COGS. *See* Conf. Staff Report at VI-39. One classified the tax credit as part of operating income and another classified it as a component of its Pulp and Paperboard segment of operating income. *See id.*

producers were not eligible to receive it, the tax credit was not reported in their financial statements at all. Def.'s Brief at 38 (*citing* Conf. Staff Report at VI-39). In light of the fact that it appears to be industry practice to exclude the tax credit from operating income, the Commission's determination to do the same was reasonable. The Foreign Producers' claims to the contrary miss their mark.

The Foreign Producers' challenges to the Commission's vulnerability analysis therefore must be rejected.

## 2. U.S. Consumption

The Foreign Producers also seek to discredit the Commission's threat of material injury determination by faulting the Commission's causation analysis. Pls.' Brief at 38. According to the Foreign Producers, the Commission's analysis failed to adequately address the impact on the U.S. industry of the projected decline in U.S. consumption. Pls.' Brief at 39. The Foreign Producers challenge the Commission's finding, asserting that it does not reflect the adverse price effects attributable to future decreases in U.S. consumption and does not distinguish such effects from those attributable to subject imports. Pls.' Brief at 39.

The Foreign Producers' challenges are baseless. The Commission examined the projected decrease in U.S. consumption, considered it as an alternative source of injury, and concluded that the projected declines in U.S. consumption would not be of a "magnitude that would render insignificant the likely effects of subject imports." Final Views at 39.[55] In light of the [[

---

[55] RISI projects "a decline of [[  ]] percent in apparent U.S. consumption from 2010 to 2011 and a further reduction of [[ ]] percent in 2012." Conf. Final Views at 55.

]] in U.S. consumption reported for every year since 2007, the Commission reasonably determined that the declines projected for 2010 to 2011 and 2011 to 2012 were [[      ]]. *See* Conf. Staff Report at II-19 – II-20. Because the Commission found that the projected decline in U.S. consumption would have little adverse effect on the U.S. industry, the Commission logically had no obligation to explain how it ensured that those (insignificant) effects were not attributed to subject imports. The Foreign Producers fail to provide any reason as to why the projected decline in U.S. consumption, which is smaller relative to the declines in previous years of the investigation, was significant. The Commission's conclusion that future declines in U.S. consumption would not attribute injury to subject imports is therefore reasonable and supported by the record.

### 3. Non-Subject Imports

The Foreign Producers' final challenge to the Commission's causation findings focuses on the Commission's analysis of the likely future role of coated paper imports from countries other than the PRC and Indonesia. Pls.' Brief at 39-40. The Foreign Producers claim that imports from the PRC and Indonesia, on the one hand, and imports from other countries, on the other hand, have alternated in taking market share from one another. Pls.' Brief at 40. In essence, the Foreign Producers argue that the two types of imports – "subject" imports and "non-subject" imports – compete with one another, instead of competing with domestic coated paper products.

The Foreign Producers point to evidence from the interim of 2009 and interim of 2010 that shows the market share of third-country imports as well as imports from the PRC and Indonesia after the institution of the trade cases. Pls.' Brief at 40. That evidence reflects imports from the PRC and Indonesia losing a large portion of their share of the U.S. market in response to the institution of the

trade cases. Pls.' Brief at 40. The Foreign Producers claim that the market share lost by imports from the PRC and Indonesia was absorbed by third-country imports on a "one-to-one" basis. Pls.' Brief at 41; Pls.' Reply Brief at 13. The Foreign Producers contend that the Commission failed to explain why imports from the PRC and Indonesia are projected to increase to such an extent that they would capture more of the U.S. market than the market share lost by third-country imports. Pls.' Brief at 41. The Foreign Producers maintain that any potential future increase in imports from the PRC and Indonesia will "disproportionately affect non-subject imports," and will have "only negligible effects" on the domestic industry. Pls.' Brief at 40.

　　　　The data cited by the Foreign Producers indicate that, from the interim of 2009 to the interim of 2010, coated paper imports from the PRC and Indonesia lost 12.9% of their U.S. market share, while coated paper imports from other countries – *i.e.*, countries not subject to the trade cases – gained 6.1% of the U.S. market share. Pls.' Brief at 40. Beyond that, the data also show that, during the same period of time, the domestic industry's share of the U.S. market increased by 6.8%. Pls.' Brief at 40. It is therefore unclear how the Foreign Producers reached the conclusion that the market share lost by coated paper imports from the PRC and Indonesia was absorbed by third-country imports on a one-to-one basis. The evidence shows that the domestic market also absorbed some of the market share lost by subject imports. *See* Pls.' Brief at 40-41. The record similarly shows that, from 2007 to 2009, the volume of coated paper imports from the PRC and Indonesia into the United States increased, while that of the domestic producers and third-country importers declined, further demonstrating that subject imports can adversely affect the domestic industry. Pls.' Brief at 39; Def.'s Brief at 41 (*citing* Conf. Staff Report at C-6-7).

The Foreign Producers also assert that the Commission failed to explain how the increased presence of coated paper imports from the PRC and Indonesia renders the U.S. market more price-competitive. Pls.' Brief at 41. The Foreign Producers claim that evidence from 2010 shows that higher priced imports from other countries that are not subject to the trade investigations replaced low-priced imports from the PRC and Indonesia. Pls.' Brief at 41. According to the Foreign Producers, the increase in imports of high-priced merchandise into the U.S. market had no effect on domestic prices. Pls.' Brief at 41. The Foreign Producers maintain that there is thus "no reason to conclude that reversing the situation will suddenly drive [domestic] prices down." Pls.' Brief at 41-42. As such, the Foreign Producers apparently maintain that an influx into the U.S. market of low-priced imports from the PRC and Indonesia would replace higher-priced imports from other countries, but would have no impact on prices for domestic products.

The Foreign Producers' argument fails to take into account the fact that, in 2010, non-subject imports were priced within APP's natural premium and were fairly competing with domestic products. *See* Staff Report at C-6 (Table C-3) (comparing subject import pricing with that of non-subject imports); *see also* Def.-Ints.' Brief at 42-43. Imports from the PRC and Indonesia, on the other hand, undersold domestic producers and, as documented by Commerce, were being sold at less than fair market value throughout the period of investigation. Final Views at 1. This difference in competition, coupled with data from the questionnaire responses that report pricing as an important determinant for domestic purchasers, reveals the flaw in the Foreign Producers' argument. Final Views at 31. In short, if the situation were "reversed" (as the Foreign Producers put it), there is good reason – based on record evidence – to expect that lower-priced imports from the PRC and Indonesia

would affect the domestic industry.  Given the importance of price in the coated paper industry, the domestic industry would not be able to compete with imports from the PRC and Indonesia unless domestic producers slashed their prices.  Final Views at 31.

The Commission cited ample evidence to explain the causal link between the increased presence of subject imports in the U.S. market and increased price competition.  None of the Foreign Producers' arguments seriously calls into question the Commission's conclusion that an influx of undervalued subject imports into the U.S. market would create price competition.  The Foreign Producers' challenges to the Commission's determination based on statutory factor (IX) must therefore be rejected.

## IV. Conclusion

For the reasons set forth above, Plaintiffs' Motion for Judgment on the Agency Record must be denied, and the Commission's affirmative final threat of material injury determination in Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from China and Indonesia, Inv. Nos. 701-TA-470-471 and 731-TA-1169-1170 (Final), USITC Pub. 4192 (Nov. 2010) – as memorialized in Certain Coated Paper Suitable For High-Quality Print Graphics Using Sheet-Fed Presses From China and Indonesia, 75 Fed. Reg. 70,289 (Nov. 17, 2010) – must be sustained.

Judgment will enter accordingly.

/s/ Delissa A. Ridgway
_____

Delissa A. Ridgway
Judge

Decided:  December 21, 2012
              New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| GOLD EAST PAPER (JIANGSU) CO., LTD., NINGBO ZHONGHUA PAPER CO., LTD., GLOBAL PAPER SOLUTIONS, PT PINDO DELI PULP AND PAPER MILLS, and PAPER MAX LTD., | : : : |
| *Plaintiffs,* | : |
| v. | : |
| UNITED STATES, | : |
| *Defendant,* | :     Court No. 10-00368 |
| and | : |
| APPLETON COATED LLC, NEWPAGE CORP., S.D. WARREN COMPANY D/B/A SAPPI FINE PAPER NORTH AMERICA, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION AFL-CIO-CLC, | : : : : |
| *Defendant-Intervenors.* | : |

## **JUDGMENT**

This case having been duly submitted for decision; and the Court, after due deliberation having rendered a decision herein;

NOW, therefore, in conformity with said decision, it is

ORDERED that Plaintiffs' Motion for Judgment on the Agency Record is hereby denied; and it is further

ORDERED, ADJUDGED, and DECREED that the U.S. International Trade Commission's final threat of material injury determination in Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from China and Indonesia, Inv. Nos. 701-TA-470-471 and 731-TA-1169-1170 (Final), USITC Pub. 4192 (Nov. 2010) – as memorialized in Certain Coated Paper Suitable For High-Quality Print Graphics Using Sheet-Fed Presses From China and Indonesia, 75 Fed. Reg. 70,289 (Nov. 17, 2010) – be, and hereby is, sustained.

/s/ Delissa A. Ridgway

———————————————

Delissa A. Ridgway, Judge

Dated:  December 21, 2012
        New York, New York